Barry I. Levy
Michael A. Sirignano
Jennifer Abreu
Brandon Barbaruolo
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees*
*Insurance Company, GEICO Indemnity Company,*
*GEICO General Insurance Company and*
*GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY, GEICO
GENERAL INSURANCE COMPANY and GEICO
CASUALTY COMPANY,                                           Docket No.: _____(        )

Plaintiffs,

-against-

EMUNA, INC. d/b/a NAVAR PHARMACY,
JAVID BAMSHAD, and JOHN DOE DEFENDANTS
"1" THROUGH "10"

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## COMPLAINT

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company and GEICO Casualty Company (collectively, "GEICO" or

"Plaintiffs"), as and for their Complaint against Defendants, Emuna, Inc. d/b/a Navar Pharmacy

("Navar Pharmacy"), Javid Bamshad ("Bamshad"), and John Doe Defendants "1" through "10"

(the "John Doe Defendants") (collectively, "Defendants"), hereby allege as follows:

1.      This action seeks to terminate a large, ongoing fraudulent scheme perpetuated by the Defendants who exploited the New York "No-Fault" insurance system by submitting more than $3.2 million in fraudulent pharmaceutical billing to GEICO. The Defendants' scheme overwhelmingly targeted expensive topical prescription drug products, which they systematically dispensed to individuals involved in automobile accidents and eligible for insurance coverage under policies of insurance issued by GEICO ("Insureds") without regard for genuine patient care. As part of the fraudulent scheme and to maximize their profits, the Defendants paid unlawful kickbacks or provided other financial incentives to steer large volumes of medically unnecessary and often invalid and/or unauthorized prescriptions to Navar Pharmacy.

2.      Navar Pharmacy purports to be a legitimate, neighborhood pharmacy operating in Brooklyn, New York, but in fact, has been used by its record owner, Bamshad, along with the John Doe Defendants, as part of a large-scale fraud scheme to exploit patients for financial gain by overwhelmingly targeting topical drugs, purportedly prescribed to relieve pain, including Lidothol 4.5-5% Patches, Lidothol 4%-1% Patches, Diclofenac Sodium 2% Solution, Diclona Gel 1%-4.5% ("Diclona Gel"), Lidocaine 5% Ointment, and Diclofenac Sodium Gel 3% (the "Fraudulent Topical Pain Products"), along with certain other prescription drug medications such as Naproxen-Esomeprazole tablets (the "Vimovo Products") (collectively, the "Fraudulent Pharmaceuticals"). The Defendants' fraud scheme began in December 2021 when Bamshad partnered with a network of individuals and entities regularly involved in No-Fault insurance fraud who could arrange for and facilitate illegal, collusive arrangements and ensure the prescription and steering of voluminous prescriptions to Navar Pharmacy.

3.      In furtherance of the scheme, the Defendants entered into illegal, collusive arrangements with various prescribing healthcare providers (the "Prescribers") and unlicensed

2

laypersons (the "Clinic Controllers") who work at or are associated with various multidisciplinary medical clinics that almost exclusively treat No-Fault patients (the "No-Fault Clinics"). Pursuant to these illegal, collusive agreements and to maximize profits, the Defendants steered the Prescribers and Clinic Controllers to prescribe and direct large volumes of prescriptions – or purported prescriptions – for the targeted Fraudulent Pharmaceuticals (i.e., the Fraudulent Topical Pain Products) to Navar Pharmacy.

4.      The Defendants, in exchange for paying kickbacks or providing other financial incentives, received thousands of medically unnecessary, duplicitous, and likely forged and unauthorized prescriptions from the Prescribers and Clinic Controllers pursuant to fraudulent predetermined protocols. The prescriptions included large volumes of illegal and invalid pre-printed "checklist-type" prescription order forms purportedly issued by numerous Prescribers operating at multiple, different "medical clinics" throughout the New York Metropolitan area, despite the requirement under New York State law that prescriptions be transmitted electronically to combat the problem of prescription fraud.

5.      As a result of their collusive arrangements with Prescribers and Clinic Controllers, Defendants submitted to GEICO an enormous volume of fraudulent billing under the name of Navar Pharmacy – including more than $2.6 million for the targeted Fraudulent Topical Pain Products. The Defendants intentionally targeted the Fraudulent Topical Pain Products to dispense to Insureds, in place of other effective but much-less costly prescription and non-prescription drug products, solely based on the medications' exorbitant pricing and high profit margins. In fact, about 84% of the billing submitted to GEICO through Navar Pharmacy was for the Fraudulent Topical Pain Products, with charges typically amounting to $3,015.41 or $2,816.35 per prescription of Lidothol 4.5-5% Patches; $2,741.28 per prescription of Lidothol 4%-1% Patches;

3

$2,149.50 per prescription of Diclofenac Sodium 2% Solution; $2,064.74 per prescription of Diclona Gel; $1,888.00 per prescription of Diclofenac Sodium Gel 3%; and from $1,522.00 to $1,524.00 per prescription of Lidocaine 5% Ointment.

6.      The Defendants' scheme not only inflated the charges submitted to GEICO and other insurers, but also posed serious risks to the patients' health, safety, and well-being.  For example, the Defendants dispensed large volumes of Fraudulent Topical Pain Products classified as "unapproved" drugs by the United States Food and Drug Administration ("FDA") in the form of Lidothol 4.5-5% Patches, Lidothol 4%-1% Patches and Diclona Gel (the "Unapproved Topical Products"), which were sourced from suppliers not registered or licensed to operate in New York State.  The Defendants also often dispensed multiple pharmaceuticals from the same therapeutic class, on the same date to the same Insured, despite signs of obvious clinical abuse and risk of therapeutic duplication, solely to maximize their billing.

7.      By this action, GEICO seeks to recover more than $1,645,000.00 that the Defendants stole from it, along with a declaration that GEICO is not legally obligated to pay reimbursement to Navar Pharmacy of approximately $1,132,607.59 in pending fraudulent No-Fault claims that the Defendants submitted or caused to be submitted through Navar Pharmacy because:

(i)      the Defendants billed for Fraudulent Pharmaceuticals that were prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care;

(ii)     the Defendants intentionally inflated the billable charges to GEICO by targeting a specific set of pharmaceutical products that they acquired at low cost and had Navar Pharmacy dispense in large volumes to Insureds at egregious charges, in place of other effective, less costly pharmaceuticals in order to exploit the reimbursement rates set forth by 12 N.Y.C.R.R. §§ 440.5(a) and (d) (the "Pharmacy Fee Schedule");

(iii)    the Defendants participated in illegal, collusive relationships in which they steered Prescribers and Clinic Controllers to direct medically unnecessary and illegal prescriptions for the Fraudulent Pharmaceuticals to Navar Pharmacy in exchange for unlawful kickbacks and other financial incentives; and

(iv)    the Defendants submitted or caused to be submitted charges for the Fraudulent Pharmaceuticals through Navar Pharmacy pursuant to illegal, duplicitous, invalid, and/or unauthorized prescriptions.

8.    The Defendants' scheme began in 2021 and continues uninterrupted to the present day as the Defendants continue to submit, or cause to be submitted, fraudulent claims to GEICO. Additionally, the Defendants continue to pursue collection on Navar Pharmacy's unpaid fraudulent claims against GEICO, as well as other New York automobile insurers.

9.    As discussed more fully below, the Defendants at all times have known that: (i) the billed-for pharmaceutical products were prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Defendants intentionally inflated the billable charges to GEICO and exploited the Pharmacy Fee Schedule by targeting a specific set of pharmaceutical products that they acquired at low cost and had Navar Pharmacy dispense to Insureds in large volumes at exorbitant charges, in place of other effective, less-costly pharmaceuticals; (iii) the Defendants participated in illegal, collusive relationships in which they steered the Prescribers and Clinic Controllers to direct medically unnecessary and illegal prescriptions for the Fraudulent Pharmaceuticals to Navar Pharmacy in exchange for unlawful kickbacks and other financial incentives; and (iv) the Defendants submitted or caused to be submitted claims for the Fraudulent Pharmaceuticals pursuant to illegal, duplicitous, invalid, and/or unauthorized prescriptions, all while continuing to seek reimbursement on unpaid fraudulent claims.

10.    Based on the foregoing, the Defendants do not have – and have never had – any right to be compensated for the Fraudulent Pharmaceuticals allegedly dispensed to GEICO Insureds. The chart attached hereto as Exhibit "1" sets forth a representative sample of the fraudulent claims that have been identified to date which the Defendants submitted, or caused to be submitted, to GEICO through Navar Pharmacy using the United States mail or through interstate wires seeking reimbursement under New York's No-fault law. As a result of the Defendants' scheme, GEICO has incurred damages of approximately $1,645,716.80.

## THE PARTIES

### I.    Plaintiffs

11.    Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland.  GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

### II.    Defendants

12.    Defendant Navar Pharmacy is a New York corporation incorporated on or about November 24, 1998, with its principal place of business at 3002 Avenue M, Brooklyn, New York. Navar Pharmacy was fist registered with the New York State Education Department Office of Professions on or about February 10, 1999.

13.    Defendant Bamshad resides in and is a citizen of New York and is the record owner of Navar Pharmacy.

14.    The John Doe Defendants are individuals and entities, presently not identifiable, who, along with the Defendants, participated in the fraudulent scheme perpetrated against GEICO by, among other things, participating in the operation and control of Navar Pharmacy, facilitating

6

the illegal, collusive agreements with the Prescribers and Clinic Controllers, and/or spearheading the pre-determined fraudulent protocols used to maximize profits without regard to genuine patient care, and who, upon information and belief, reside in and are citizens of New York.

## JURISDICTION AND VENUE

15.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1332(a)(1) because the controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

16.    Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq., the Racketeer Influenced and Corrupt Organizations ("RICO") Act, because they arise under the laws of the United States.

17.    In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

18.    Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

### I.    An Overview of New York's No-Fault Laws

19.    GEICO underwrites automobile insurance in the state of New York.

20.    New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need.  Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101 et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 165

et seq.) (collectively referred to herein as the "No-Fault Laws"), automobile insurers ae required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

21.    No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for health care goods and services.

22.    The No-Fault Laws limit reimbursement for benefits to prescription drugs only. over-the-counter ("OTC") drugs and products which may be purchased without a prescription are not covered expenses under the No-Fault Laws.

23.    An Insured can assign his or her right to No-Fault Benefits to the providers of healthcare services in exchange for those services.  Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for necessary goods and medical services provided, using the claim form required by the New York State Department of Insurance (known as the "Verification of Treatment by Attending Physician or Other Provider of Health Service," or, more commonly, as an "NF-3").  In the alternative, healthcare providers sometimes submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 Form").

24.    Pursuant to New York's No-Fault Laws (11 N.Y.C.R.R. § 65-3.16(a)(12)), a healthcare provider is not eligible to receive No-Fault Benefits if it fails to meet any applicable New York state or local licensing requirement necessary to perform such services in New York.

25.    The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12), provides, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State of local licensing requirement necessary to perform such service in New York… (emphasis supplied).

8

26.      In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005) and Andrew Carothers, M.D., P.C. v. Progressive Ins. Co., 33 N.Y.3d 389, 393 (2019), the New York Court of Appeals made clear that (i) healthcare providers that fail to comply with material licensing requirements are ineligible to collect No-Fault Benefits, and (ii) only licensed providers may practice a profession in New York because of the concern that unlicensed persons are "not bound by ethical rules that govern the quality of care delivered by a physician to a patient."

27.      Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 Forms submitted by a healthcare provider to GEICO, and to all other automobile insurers, must be verified by the healthcare provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

28.      Pharmacies "may be held liable for medically unnecessary services" submitted to No-Fault insurers similar to other "downstream providers." See Gov't Emples. Ins. Co.  v. Advanced Comp. Lab., L.L.C., 2020 WL 7042648 (E.D.N.Y. 12/1/2020); 2020 U.S. Dist. LEXIS 224868 (E.D.N.Y. 12/1/2020); Gov't Emples. Ins. Co. v. Wellmart RX, Inc., 435 F. Supp. 3d 443 (E.D.N.Y. 2020). See also Long Is. Radiology v. Allstate Ins. Co., 36 A.D.3d 763, 764 (2d Dept. 2007.

## II.      An Overview of Applicable Licensing Laws

29.      Pursuant to New York Education Law § 6808, no person, firm, corporation, or association shall possess drugs, prescriptions or poisons for the purpose of compounding, dispensing, retailing, wholesaling or manufacturing, or shall offer drugs, prescriptions or poisons

for sale at retail or wholesale unless registered by the New York State Department of Education as a pharmacy, wholesaler, manufacturer, or outsourcing facility.

30.     Pursuant to 8 N.Y.C.R.R. § 29.1, pharmacies in New York are prohibited from "exercising undue influence on the patient or client, including the promotion of the sale of services, goods, appliances or drugs in such a manner as to exploit the patient or client for the financial gain of the practitioner or of a third party."

31.     Similarly, 8 N.Y.C.R.R. § 29.1, prohibits pharmacies from "directly or indirectly offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or client in connection with the performance of professional services."

32.     Pursuant to 8 N.Y.C.R.R. § 63.1(7), pharmacists or pharmacy interns shall conduct a prospective drug review before each prescription is dispensed, which review shall include screening for potential drug therapy problems due to contraindications, therapeutic duplication, drug-drug interactions, including serious interactions with over-the-counter drugs, incorrect drug dosage or duration of drug treatment, drug-allergy interactions, and clinical abuse or misuse.

33.     New York Education Law § 6810 prohibits pharmacies from dispensing a drug when the prescription form for that drug includes any other drug. Separate prescriptions are required for each drug prescribed and dispensed.

34.     Pursuant to New York Education Law § 6810, as of March 27, 2016 "no practitioner shall issue any prescription in this state, unless such prescription is made by electronic prescription from the practitioner to a pharmacy." Permitted exceptions include: (1) electrical or technological outages, (2) a waiver granted to the prescriber by the New York State Commissioner of Health based on a demonstrated exceptional hardship, (3) the use of electronic prescribing

10

would cause a delay that would adversely affect the patient's health, (4) telephone prescriptions issued in emergency situations.

35.    For any non-electronic prescriptions issued in the state, New York Education Law § 6810 requires the prescriber to explicitly state in the patient's health record the specific exempt reason for why the prescription was issued in a manner other than electronically.

36.    New York Education Law § 6810 prohibits persons and corporations, not licensed to issue a prescription, to willfully cause prescription forms, blanks, or facsimiles thereof to be disseminated to any person other than a person who is licensed to issue a prescription.

37.    New York Education Laws § 6512, § 6530(11), (18), and (19), prohibit aiding and abetting an unlicensed person to practice a profession, offering any fee or consideration to a third party for the referral of a patient, and permitting any person not authorized to practice medicine to share in the fees for professional services is considered a crime and/or professional misconduct.

38.    New York Education Law § 6530(17) prohibits a physician from "exercising undue influence" on the patient by promoting the sale of drugs so as to exploit the patient for financial gain of the licensee or of a third party.

39.    New York Education Law § 6530(18) prohibits a physician from "directly or indirectly" offering, giving, soliciting, receiving or agreeing to receive any fee or other consideration to or from a third party in connection with the performance of professional services.

40.    New York Education Law § 6509-a prohibits a professional licensee from "directly or indirectly" requesting, receiving, or participating in the division, transference, assignment, rebate, splitting or refunding of a fee in connection with professional care or services related to drugs and/or medications.

41.     Pursuant to New York Education Law § 6808(2)(c), "[t]he names of the owner or owners of a pharmacy shall be conspicuously displayed upon the exterior of such establishment. The names so displayed shall be presumptive evidence of ownership of such pharmacy by such person or persons."

42.     Pursuant to New York Law § 6808(e), every pharmacy shall be under the immediate supervision and management of a licensed pharmacist.

43.     Pursuant to New York Education Law § 6808(e), pharmacy owners and supervising pharmacists shall be responsible for the proper conduct of a pharmacy.

44.     Pursuant to New York Education Law § 6808(e), pharmacy owners are responsible "for the strength, quality, purity and the labeling thereof of all drugs, toxic substances, devices and cosmetics, dispensed or sold, subject to the guaranty provisions of this article and the public health law."

45.     Pursuant to New York Education Law § 6808(h), "an application for registration as a pharmacy shall be over good moral character."

### III.    The Defendants' Scheme Involving the Fraudulent Pharmaceuticals

####    A.    Overview of the Scheme

46.     Beginning in 2021, and continuing uninterrupted through the present day, the Defendants implemented a fraudulent scheme in which they used Navar Pharmacy to exploit patients for financial gain by billing the New York automobile insurance industry for millions of dollars in inflated charges – which they were not entitled to receive – for the Fraudulent Pharmaceuticals purportedly dispensed to the Insureds.

47.     Navar Pharmacy purports to be a storefront neighborhood pharmacy operating in and catering to the local community in Brooklyn, New York, when in fact, the Defendants used

Navar Pharmacy as part of a large-scale fraud scheme that exploited GEICO's Insureds, as well as insureds of other New York automobile insurers, through the prescribing and dispensing of the Fraudulent Pharmaceuticals in a predetermined, protocol fashion, without regard for medical necessity, while intentionally ignoring a vast array of other medications readily available at a fraction of the cost.

48.    Unlike legitimate pharmacies dispensing a wide variety of pharmaceutical products, Navar Pharmacy's business targeted a limited set of pharmaceutical products, which made up the overwhelming majority of claims submitted to GEICO. Specifically, the Defendants have submitted – to GEICO alone – over $2.6 million in claims for reimbursement for the Fraudulent Topical Pain Products, which account for more than 83% of the billing submitted through Navar Pharmacy to GEICO.

49.    The Fraudulent Topical Pain Products overwhelmingly targeted by the Defendants included Lidocaine and Diclofenac products, with charges typically amounting to $3,015.41 or $2,816.35 per prescription of Lidothol 4.5-5% Patches; $2,741.28 per prescription of Lidothol 4%-1% Patches; $2,149.50 per prescription of Diclofenac Sodium 2% Solution; $2,064.74 per prescription of Diclona Gel; $1,888.00 per prescription of Diclofenac Sodium Gel 3%; and from $1,522.00 to $1,524.00 per prescription of Lidocaine 5% Ointment.

50.    The Defendants chose these products – Lidothol 4.5-5% Patches, Lidothol 4%-1% Patches, Diclofenac Sodium 2% Solution, Diclona Gel, Diclofenac Sodium Gel 3%, and Lidocaine 5% Ointment – because they could acquire them at low cost and submit claims for reimbursement to GEICO at exorbitant prices after illegally steering prescriptions to themselves. Moreover, the Defendants knew that similar OTC products that could be recommended to Insureds were not covered under the No-Fault Laws, thus leading the Defendants to target the prescription of the

Fraudulent Topical Pain Products despite the lack of medical necessity for these particular products.

51.     Not surprisingly, the Office of the Inspector General of the U.S. Department of Health and Human Services noted that Lidocaine and Diclofenac have been two of the most common products subject to fraud and abuse by pharmacies with questionable billing. See Questionable Billing For Compounded Topical Drugs in Medicare Part D, OEI-02-16-00440 (August 2018).

52.     The remaining billing submitted to GEICO through Navar Pharmacy was primarily for an exorbitantly priced pain reliever medication, i.e., the Vimovo Products and other oral non-steroidal anti-inflammatory drugs ("NSAIDs"), which further inflated the charges submitted through Navar Pharmacy as part of the scheme to defraud GEICO.

53.     Defendant Bamshad, together with the John Doe Defendants, operate Navar Pharmacy for the sole purpose of effectuating a multimillion-dollar pharmacy fraud scheme.

54.     In December 2021, Bamshad joined a network of individuals and entities regularly involved in No-Fault insurance fraud who were familiar with the No-Fault Clinics and could arrange for fraudulent claims to be billed and collected as quickly as possible from New York automobile insurance companies to generate large profits without regard to genuine patient care.

55.     Upon joining the network, which included a collection law firm, a purported No-Fault billing company, and a purported delivery company, the Defendants began targeting and receiving large volumes of prescriptions for the Fraudulent Pharmaceuticals.

56.     Navar Pharmacy has been registered and operated as a pharmacy since 1999 but submitted no billing to GEICO aside from nominal billing in 2016 and 2017 totaling less than $1,100.00.  Thereafter, beginning in December 2021, Navar Pharmacy suddenly began submitting

substantial billing to GEICO as part of the Defendants' fraudulent scheme. In fact, within six months after the onset of its billing, Navar Pharmacy submitted more than $545,000.00 in pharmaceutical billing to GEICO alone and likely more to other New York automobile insurers.

57.     The sudden, voluminous billing from Navar Pharmacy for the Fraudulent Topical Pain Products and other Fraudulent Pharmaceuticals coincided with the Defendants' engagement of Gary Tsirelman PC (the "Tsirelman PC"), Billing Experts Inc. ("Billing Experts"), Drug Lift Corp. ("Drug Lift"), and the Defendants' collusion with the Prescribers and Clinic Controllers, in which the Defendants steered them to prescribe and direct large volumes of prescriptions to Navar Pharmacy for specifically targeted Fraudulent Pharmaceuticals, which were purportedly prescribed and dispensed to patients at the No-Fault Clinics.

58.     In furtherance of the fraudulent scheme, the Defendants and the John Doe Defendants entered into complex financial arrangements with one another and others, including the Prescribers and Clinic Controllers at the No-Fault Clinics, that were designed to, and did, conceal the fact that the Defendants unlawfully exchanged kickbacks or other financial incentives for large volumes of medically unnecessary prescriptions for specifically targeted Fraudulent Topical Pain Products.

59.     The prescriptions for the Fraudulent Topical Pain Products steered to Navar Pharmacy were typically based on generic, preprinted, and boilerplate examination reports meant to justify continuous, voluminous, and excessive healthcare services, including prescriptions for pharmaceuticals, as part of predetermined protocols and collusive arrangements. Further, the Fraudulent Topical Pain Products themselves often had no proven efficacy beyond what an over-the-counter equivalent could provide and were often duplicative of other medications contemporaneously prescribed and dispensed to the Insureds.

60.     The Prescribers and No-Fault Clinics that were the source of the prescriptions steered to Navar Pharmacy have been the subject of investigations and lawsuits with regard to their fraudulent billing and treatment practices, and have been the source of excessive, fraudulent treatment and billing schemes aimed at generating profits without regard to genuine patient care.

61.     Unlicensed laypersons (i.e., the Clinic Controllers), rather than the healthcare professionals working at the No-Fault Clinics, create and control the patient bases at the clinics, dictate predetermined fraudulent treatment protocols used to maximize profits without regard to actual patient care, and select and dictate the downstream providers (like, pharmacies) that receive prescriptions and referrals issued at the No-Fault Clinics. These predetermined protocols almost always involve the rendering and prescribing of excessive medically unnecessary healthcare goods and services and illegal referral and/or prescription practices.

62.     To facilitate the steering of large volumes of prescriptions for the targeted Fraudulent Pharmaceuticals, the Defendants arranged for the use of illegal and invalid non-electronic, pre-printed "checklist-type" prescription order forms (the "Fraudulent Prescription Forms") as a basis to dispense large volumes of Fraudulent Pharmaceuticals in a predetermined, protocol fashion without regard to genuine patient care.

63.     As of March 27, 2016, to combat the growing problem of prescription fraud, N.Y. Public Health Law requires that all prescriptions issued in New York State – for both controlled and non-controlled substances – must be prescribed electronically.

64.     The limited exceptions to New York State's electronic prescription requirement include: (i) temporary technological or electronic failure, (ii) a waiver granted to the prescriber by the New York State Commissioner of Health, (iii) a determination by the prescriber that it would be impractical for patients to receive prescriptions in a timely manner if prescribed electronically,

or (iv) the prescription will be dispensed by a pharmacy outside of New York State. See N.Y. Public Health Law § 281.

65.    In the limited circumstances in which a prescription is excepted from the electronic prescription requirement, N.Y. Public Health Law requires that a written prescription in New York State be written on an official serialized New York State prescription blank bearing the prescriber's signature as well as the legible, conspicuous imprinted or stamped name of the authorized prescribing healthcare provider. See N.Y. Public Health Law § 281; see also N.Y. Education Law § 6810(8). Moreover, New York Education Law § 6810 requires the prescriber to explicitly state in the patient's health record the specific exempt reason for why the prescription was issued in a manner other than electronically.

66.    The Defendants, however, submitted the Fraudulent Prescription Forms not for legitimate reasons, but because they were engaged in collusive agreements and fraudulent protocols to have prescriptions steered to them, so as to claim reimbursement for the Fraudulent Pharmaceuticals as part of their fraudulent scheme.

67.    The Fraudulent Prescription Forms contained pre-printed names of predetermined Fraudulent Pharmaceuticals, including certain Fraudulent Topical Pain Products and the quantity in which they were to be prescribed and dispensed to Insureds.

68.    The Defendants and/or Clinic Controllers created and distributed the Fraudulent Prescription Forms to Prescribers in violation of law and to further facilitate the prescription of targeted Fraudulent Pharmaceuticals and the steering of those prescriptions to Navar Pharmacy.

69.    In keeping with fact that the Fraudulent Pharmaceuticals were prescribed, dispensed, and billed pursuant to fraudulent, predetermined protocols and collusive arrangements, Navar Pharmacy received large volumes of Fraudulent Prescription Forms from at least eight

different practitioners operating from numerous different clinics located throughout the metropolitan area.

70.    For example, Navar Pharmacy received Fraudulent Prescription Forms for Lidothol 4.5-5% Patches purportedly issued by Christian Bannerman, M.D. ("Dr. Bannerman") who is the record owner of ACE Emergent Medical Care P.C. ("ACE Emergent") and purported to render healthcare services at the No-Fault Clinic located at 108-25 Merrick Boulevard, Jamaica, New York (the "Merrick Blvd. Clinic").

71.    Notably, Dr. Bannerman stated under oath, in connection with the Merrick Blvd. Clinic, that: (i) in 2011, ACE Emergent began operating out of the Merrick Blvd. Clinic but he had no role in choosing the pharmacies that received his prescriptions and instead, the Merrick Blvd. Clinic chose and steered the prescriptions to certain pharmacies; (ii) in June of 2021, he moved to California and since then, has not personally treated any patients or issued any prescriptions or referrals for healthcare services and/or goods; and (iii) he has not authorized anyone at the Merrick Blvd. Clinic to use his signature or use a stamp with his signature to issue prescriptions.  Despite this, Navar Pharmacy submitted Fraudulent Prescription Forms in support of its billing to GEICO using Dr. Bannerman's name and prescription orders with dates after Dr. Bannerman had moved to California and after he ceased treating patients at the Merrick Blvd. Clinic.

72.    Navar Pharmacy also received Fraudulent Prescription Forms for Lidothol 4.5-5% Patches purportedly issued by Ataul Chowdhury, M.D. ("Dr. Chowdhury").  Dr. Chowdhury has been named as a defendant in multiple No-Fault fraud actions filed in federal court (see e.g., Gov't Emples. Ins. Co. v. East Flatbush Medical, P.C. et al., Dkt. 1:20-cv-01695-MKB-TAM (E.D.N.Y. 2020)), but he also has stated under oath that, in connection with a No-Fault Clinic at issue in East

18

Flatbush Medical, P.C., referrals and prescriptions were issued under his name without his authorization, including prescriptions for various topical pharmaceutical products issued to patients he never even examined.

73.     The Defendants also submitted claims for reimbursement based on Fraudulent Prescription Forms purportedly issued by John Greco, M.D. ("Dr. Greco") who is associated with Tri-Borough NY Medical Practice PC ("Tri-Borough Medical") and purported to render healthcare services at the No-Fault Clinic located at 1767 Southern Boulevard, Bronx, New York (the "Southern Blvd. Clinic").   Notably, Tri-Borough Medical and its record owner, Leonid Shapiro, M.D. are named as defendants in a lawsuit pending in the Eastern District of New York alleging that Tri-Borough Medical, Shapiro and others engaged in illegal kickback arrangements and billed for fraudulent services that were not medically necessary to financially enrich themselves and others. See State Farm Mut. Ins. Co. et al. v. Metro Pain Specialists, P.C. et. al., 21-cv-05523 (MKB)(PK) (E.D.N.Y. 2021); see also Gov't Emples Ins. Co. v. Yan Moshe et. al., 20-cv-01098 (FB)(RER) (E.D.N.Y. 2020).

74.     Moreover, Navar Pharmacy received many Fraudulent Prescription Forms from multiple Prescribers who purportedly rendered healthcare services at the No-Fault Clinic located at 1122 Coney Island Ave, Brooklyn, New York (the "Coney Island Clinic").  The Coney Island Clinic is a purported multidisciplinary "medical clinic" that treats patients with No-Fault insurance but in actuality, provides facilities for professional corporations, chiropractic professional corporations, physical therapy professional corporations, and/or a multitude of other purported healthcare providers, all geared towards exploiting New York's No-Fault insurance system. In fact, GEICO has received billing for purported healthcare services from a "revolving door" of more than 100 purportedly different healthcare provider "names" at the Coney Island Clinic.

75.    The Fraudulent Prescription Forms steered and ensured that the Prescribers would prescribe predetermined Fraudulent Pharmaceuticals, overwhelmingly in the form of Lidothol 4.5-5% Patches, which Navar Pharmacy thereafter billed at exorbitant charges.

76.    Notably, the Prescribers' examination reports routinely failed to document the exempt reason for the issuance of a non-electronic prescription.

77.    In further keeping with the fact that the Fraudulent Pharmaceuticals were prescribed and dispensed pursuant to predetermined protocols and illegal kickbacks, the Fraudulent Prescription Forms often contained photocopied, stamped or illegible signatures purporting to be those of the Prescribers.

78.    Moreover, in some instances, Navar Pharmacy filled Fraudulent Prescription Forms containing various different signatures despite the fact that they were purportedly signed by a single Prescriber.

79.    Upon information and belief, the Defendants intentionally submitted Fraudulent Prescription Forms, that were unauthorized by the purported Prescriber and/or were issued without the knowledge of the Prescriber, to claim reimbursement of inflated charges to which they were never entitled.

80.    The Defendants' submission of large volumes of billing to GEICO based on the Fraudulent Prescription Forms purportedly issued by numerous Prescribers associated with multiple different No-Fault Clinics has no legitimate explanation, beyond the fact that the Defendants engaged in illegal, collusive arrangements to steer the Prescribers and Clinic Controllers to direct illegal prescriptions for targeted Fraudulent Pharmaceuticals to Navar Pharmacy.

81. A sample of the Fraudulent Prescription Forms purportedly issued by the Prescribers, which the Defendants submitted to GEICO in support of their fraudulent billing, is annexed hereto as Exhibit "2."

82. During the examination under oath ("EUO") of Navar Pharmacy, Bamshad testified that no particular medical offices are responsible for a majority of the prescriptions steered to the pharmacy. Despite this, and in further keeping with the fact that the prescriptions were the byproducts of illegal, collusive arrangements, a substantial majority of the billing submitted to GEICO by Navar Pharmacy was based on prescriptions purportedly issued by only two Prescribers – Ranga Krishna, M.D. ("Dr. Krishna") and George Davydov P.A. ("PA Davydov").

83. Between December 2021 and June 2024, Dr. Krishna and PA Davydov's purported prescriptions were responsible for nearly 70% of Navar Pharmacy's billing to GEICO. Specifically, Dr. Krishna's prescriptions alone are responsible for more than $1 million in pharmaceutical billing to GEICO, while PA Davydov's prescriptions are responsible for more than $459,000.00 in pharmaceutical billing.

84. Even further, more than 59% of the pharmaceutical billing submitted to GEICO by Navar Pharmacy was based on prescriptions steered from only three No-Fault Clinics: (i) the Coney Island Clinic; (ii) 1513 Voorhies Ave, Brooklyn, New York (the "Voorhies Ave Clinic"); and (iii) 2932 Wilkinson Ave, Bronx, New York (the "Wilkinson Ave Clinic").

85. The Defendants' scheme to dispense the Fraudulent Pharmaceuticals in large volumes using kickbacks or other financial incentives ensured that the Prescribers and Clinic Controllers directed prescriptions for the Fraudulent Pharmaceuticals to Navar Pharmacy regardless of (i) the distance of the pharmacy to the Insureds' residences or the Prescribers'

practices and (ii) the fact that there were countless other pharmacies located much closer to the Insureds' residences.

86. In further keeping with the fact that the Defendants illegally steered the Prescribers and Clinic Controllers at the No-Fault Clinics to provide Navar Pharmacy with prescriptions pursuant to predetermined protocols and illegal collusive arrangements, the Insureds were virtually never given the option to use a pharmacy of their choosing.

87. In fact, more than 57% of the Insureds that allegedly received pharmaceuticals dispensed by Navar Pharmacy lived outside of Kings County, New York, where the pharmacy is located, with these Insureds' residences scattered throughout the Bronx, Queens, Manhattan, and Long Island, including Nassau and Suffolk County.

88. In some instances, the Insureds who received, or purportedly received, pharmaceuticals dispensed by Navar Pharmacy lived in cities and counties outside of New York City, including Richmond County, Orange County, Bergen County, Westchester County, and with some residences located outside of the State of New York, such as New Jersey, Pennsylvania, Connecticut, Massachusetts, Georgia, and Florida.

89. But for the Defendants' illegal, collusive agreements with the Prescribers and Clinic Controllers, these Insureds would not have received the Fraudulent Pharmaceuticals from a pharmacy that is located in a county or city outside of their place of residence.

90. Instead, the Prescribers and Clinic Controllers directed prescriptions (or purported prescriptions) for the Fraudulent Pharmaceuticals to Navar Pharmacy, irrespective of the pharmacy's inconvenient location to the Insureds' residences or the Prescribers' practices, because the prescriptions were being issued pursuant to illegal, collusive kickback agreements.

91.     Navar Pharmacy, in exchange for the payment of kickbacks or other financial incentives, received medically unnecessary prescriptions and/or invalid and unauthorized prescriptions from the Prescribers and Clinic Controllers at the No-Fault Clinics pursuant to fraudulent predetermined protocols.

92.     The Defendants used the prescriptions the prescriptions, or purported prescriptions, obtained from the No-Fault Clinics to bill GEICO and other insurers for the Fraudulent Pharmaceuticals.

93.     The Prescribers had no legitimate medical reason to prescribe the Fraudulent Pharmaceuticals in large quantities to their patients.

94.     After having the prescriptions steered to Navar Pharmacy, the Defendants purportedly delivered the Fraudulent Pharmaceuticals directly to the Insureds' residences, or alternatively, delivered the Fraudulent Pharmaceuticals to the No-Fault Clinics.

95.     In furtherance of the scheme, the Defendants use Tsirelman PC to pursue collection from GEICO on the bills for the Fraudulent Pharmaceuticals in piece-meal fashion, through numerous, separate expedited "No-Fault arbitrations" and/or individual civil court lawsuits, all of which is designed to obscure the fraud and monetize the scheme as quickly as possible. Tsirelman PC, and potentially other law firms, routinely file expensive and time-consuming collection proceedings against GEICO and other insurers if the charges are not promptly paid in full. In fact, the Defendants continue to have legal counsel pursue collection against GEICO and other insurers without regard for the fact that Navar Pharmacy has been engaged in fraud.

96.     The Defendants' collection efforts through numerous, separate no-fault collection proceedings, which proceedings may continue for years, is an essential part of their fraudulent scheme since the Defendants know it is impractical for a no-fault arbitrator or civil court judge in

a single no-fault arbitration or civil court proceeding, typically involving a single bill, to uncover or address the Defendants' large scale, complex fraud scheme involving numerous patients across numerous different clinics located throughout the metropolitan area.

97.    The Defendants implemented their pharmaceutical fraud scheme involving the Prescribers and Clinic Controllers knowing that: (i) the Fraudulent Pharmaceuticals were prescribed and dispensed pursuant to predetermined protocols designed to exploit the patients for financial gain, without regard to genuine patient care; (ii) the Defendants intentionally inflated the billable charges to GEICO by targeting a specific set of pharmaceutical products that they dispensed in large volumes to Insureds through Navar Pharmacy with exorbitant charges; (iii) the Fraudulent Pharmaceuticals were the product of illegal, collusive agreements intended to inflate the billing from Navar Pharmacy to insurers and to financially enrich the Defendants; (iv) the Fraudulent Pharmaceuticals were prescribed and dispensed without regard for the availability of a wide range of OTC and prescription medications proven to have therapeutic effects and available at a fraction of the cost; and (v) in many cases, the prescriptions were illegal, duplicitous, invalid and/or unauthorized.

**B.    The Fraudulent Pharmaceuticals Were Prescribed and Dispensed For Financial Gain and Without Regard to Genuine Patient Care**

98.    In basic terms, the goal of medical treatment is to help each patient get better in a timely manner and to provide an appropriate and medically necessary course of treatment for each patient's individual needs. Notwithstanding this basic goal, the Insureds treated by the Prescribers at No-Fault Clinics associated with the Clinic Controllers – and who received pharmaceuticals from Navar Pharmacy – were virtually always subjected to a predetermined, medically unnecessary, and prolonged treatment protocol, which completely lacked individualized care and

failed to utilize evidence-based medical practices with the goal of Insureds' medically appropriate and necessary treatment and timely return to good health.

99.    Evidence-based best practices guidelines for the treatment of acute and chronic pain do exist and should always guide prescribing habits.  For example, the World Health Organization ("WHO") pain relief ladder recommends a non-opioid such as acetaminophen or an oral non-steroidal anti-inflammatory drug ("NSAID") for the initial management of pain.  Oral NSAIDs are the most commonly prescribed analgesic medications worldwide, and their efficacy for treating acute pain has been well demonstrated.  If pain relief is not achieved, and doses are maximized, then an adjuvant oral agent may be added to the medication regimen – including the use of muscle relaxers and medications that block neuropathic pain transmission. Finally, opiates may be prescribed for short-term, limited use.

100.    More recently, in 2019, the Department of Health & Human Services ("DHHS") issued a Pain Management Best Practices Inter-Agency Task Force Report, which focused on pain management and the treatment of acute and chronic pain.  According to the DHHS report, such pain should be treated using an individualized, multimodal approach which may include prescription medications depending on various biological, psychological, and social factors of an individual patient, including, but not limited to, a patient's age, medical history, pain tolerance, genetics and neurological factors, stress level, coping ability, social support, and even education and cultural factors.  A risk-benefit analysis should be applied to each patient prior to determining whether a medication is clinically appropriate.  Like the WHO pain relief ladder, the DHHS report indicates that non-opioids (e.g., oral NSAIDs) should be used as first line therapy for patients for whom these medications are clinically appropriate.

101.    Like the WHO and DHHS, the New York State Workers' Compensation Board's ("NYS WCB") published medical treatment guidelines stating that oral NSAIDs are recommended as first-line medications for the treatment of neck and back pain, and that over-the-counter medications should be tried prior to prescription NSAIDs. See New York State Workers' Compensation Board Medical Treatment Guidelines, Mid and Lower Back Injury (May 2022, p. 36); New York State Workers' Compensation Board Medical Treatment Guidelines, Mid and Lower Back Injury (May 2022, p. 32).

102.    Drugs should not be prescribed when there is no indication for use as every medication carries an inherent risk for adverse events.

103.    Notably, for a drug to alleviate pain it must reach nerve or tissue receptors responsible for producing or transmitting a person's sensation of pain.

104.    Oral pain relievers reduce or alleviate pain by entering the bloodstream through the gastrointestinal system and traveling to the relevant nerve or tissue receptors.  Some of the limited circumstances in which a physician would prescribe a topical medication include patients in whom these oral medications are contraindicated.  For example – patients with moderate to severe kidney or liver dysfunction, or those with comorbidities that preclude the use of oral NSAIDs (e.g., history of peptic ulcer disease, coronary artery disease, or congestive heart failure).

105.    With respect to treating acute pain (e.g., from strains, sprains, contusions, or overuse injuries), clinical studies of FDA-approved topical NSAIDs, such as Diclofenac Gel 1% have shown that they are no more effective than a placebo.

106.    Despite these guidelines and the basic goal underlying the practice of medicine to help patients recover in a timely fashion and with a medically necessary course of treatment for that patient's individual clinical needs, the Insureds who received pharmaceuticals from Navar

Pharmacy, and who were purportedly treated by the Prescribers at the No-Fault Clinics associated with the Clinic Controllers, were virtually always subjected to a predetermined and unnecessarily prolonged treatment protocol, which completely lacked in individualized care and failed to utilize evidence-based medical practices with the goal of the Insureds' receiving medically appropriate and necessary care and a timely return to good health.

107.    Pursuant to these predetermined protocols, the Prescribers produced generic, preprinted, and boilerplate examination reports designed to justify continued, voluminous, and excessive healthcare services that the healthcare providers at the various No-Fault Clinics purported to render to Insureds – including the prescription of excessive and medically unnecessary pharmaceutical drug products.

108.    Notwithstanding the creation of the examination reports, the Prescribers' prescriptions for the Fraudulent Pharmaceuticals dispensed by Navar Pharmacy were based on predetermined protocols designed to exploit Insureds for financial gain, without regard to the genuine needs of the patients.

109.    Indeed, the manner in which the Insureds were prescribed and dispensed the Fraudulent Pharmaceuticals reflects a protocol driven scheme with little to no relationship to the patients' clinical needs or patient history, deviates from the medical standards of care, and demonstrates a gross indifference to patient health and safety.

110.    Prescribing a multitude of pharmaceutical drug products based on generic, preprinted, and boilerplate examination reports lacking a detailed patient history demonstrates a gross indifference to patient health and safety.

111.    The Prescribers also did not document in their examination reports whether the patients were intolerant of oral medications or tried and failed any over-the-counter topical

medications necessitating a prescription for the Fraudulent Topical Pain Products dispensed by Navar Pharmacy.

112. The Prescribers also failed to document in their follow-up examination reports whether the Fraudulent Pharmaceuticals prescribed to a particular patient and dispensed by Navar Pharmacy were actually used by the patient, and, if so, whether they provided any pain relief or were otherwise effective for the purpose prescribed.

113. In many instances, the Prescribers failed to document in their examination reports that the patient was to receive a Fraudulent Pharmaceutical.

114. Nevertheless, the Prescribers routinely prescribed voluminous Fraudulent Pharmaceuticals, including multiple Fraudulent Topical Pain Products on the same date to a single patient.

115. In keeping with the need for individualized care, each patient that has, or is in, an accident, including motor vehicle accidents, is exposed to a set of unique mechanical events and their injuries are a direct result of those specific forces, hence their injuries are unique. In addition, an individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact will all affect whether, how, and to what extent an individual is injured in a given motor vehicle accident.

116. Despite the fact that the Insureds were of different ages, heights, weights, and in different physical conditions, and likely reacted to the accidents in different ways, virtually all of these individuals were unnecessarily prescribed large quantities of Fraudulent Pharmaceuticals in an excessive and systematic manner.

117. It is extremely improbable that multiple Insureds involved in the same motor vehicle accident would routinely require the same pharmaceutical products in voluminous

quantities. Even so, pursuant to the predetermined treatment protocols and illegal, collusive arrangements, and as demonstrated herein, Prescribers purported to prescribe, and the Defendants dispensed, the same set of Fraudulent Pharmaceuticals to multiple Insureds involved in a single motor vehicle accident, without regard to individualized, genuine patient care.  For example:

- On March 5, 2023, two Insureds – SP and EP – were involved in the same automobile accident. Thereafter, SP and EP received, or allegedly received, examinations from Dr. Krishna of Total Neuro Care P.C. ("Total Neuro Care") at the Voorhies Ave Clinic. SP and EP were in different physical conditions and experienced the impact from different positions in the vehicle. Nonetheless, SP and EP were issued prescriptions for the same set of Fraudulent Pharmaceuticals, which were dispensed by Navar Pharmacy.  In particular:

  o On June 28, 2023, one day *after* a purported examination, three (3) prescriptions were allegedly issued to SP by Dr. Krishna for Lidothol 4.5-5% Patches, Diclofenac Sodium Gel 3%, and Ibuprofen-Famotidine (brand name: Duexis) with one refill for each pharmaceutical, which were dispensed by Navar Pharmacy on July 6, 2023 and July 29, 2023.  Notably, there was no mention of the prescribed pharmaceuticals in Dr. Krishna's medical report, yet the prescriptions were steered to Navar Pharmacy.

  o On June 28, 2023, one day *after* a purported examination, three (3) prescriptions were allegedly issued to EP by Dr. Krishna for Lidothol 4.5-5% Patches, Diclofenac Sodium Gel 3%, and Ibuprofen-Famotidine (brand name: Duexis) with one refill for each pharmaceutical, which were dispensed by Navar Pharmacy on July 6, 2023 and July 29, 2023.  Notably, there was no mention of the prescribed pharmaceuticals in Dr. Krishna's medical report, yet the prescriptions were steered to Navar Pharmacy.

- On December 31, 2022, two Insureds – YA and JA – were involved in the same automobile accident. Thereafter, YA and JA received, or allegedly received, examinations from Dr. Krishna of Westchester Medical Care P.C. ("Westchester Medical") at a No-Fault Clinic located at the Voorhies Ave Clinic. YA and JA were in different physical conditions and experienced the impact from different positions in the vehicle.  Nonetheless, YA and JA were issued prescriptions for the same set of Fraudulent Pharmaceuticals, which were dispensed by Navar Pharmacy.  In particular:

  o On October 17, 2023, one day *after* a purported examination, three (3) prescriptions were allegedly issued to YA by Dr. Krishna for Lidothol 4.5-5% Patches, Diclona Gel, and Vimovo with one refill for each pharmaceutical, which were dispensed by Navar Pharmacy on October 21, 2023.

29

o On October 17, 2023, one day *after* a purported examination, three (3) prescriptions were allegedly issued to JA by Dr. Krishna for Lidothol 4.5-5% Patches, Diclona Gel, and Vimovo with one refill for each pharmaceutical, which were dispensed by Navar Pharmacy on October 21, 2023.

- On December 2, 2023, three Insureds – JZ, JQZ and GFZ – were involved in the same automobile accident. Thereafter, JZ, JQZ, and GFZ received, or allegedly received, examinations from Irving Friedman, M.D. ("Dr. Freidman") at a No-Fault Clinic located at 575 Kings Highway, Brooklyn, New York. JZ, JQZ, and GFZ were in different physical conditions and experienced the impact from different positions in the vehicle. Nonetheless, JZ, JQZ, and GFZ were issued prescriptions for the same set of Fraudulent Pharmaceuticals, which were dispensed by Navar Pharmacy. In particular:

  o On December 8, 2023, two (2) prescriptions were allegedly issued to JZ by Dr. Friedman for Lidothol 4.5-5% Patches and Vimovo with five refills for each pharmaceutical, which were dispensed by Navar Pharmacy on December 9, 2023, January 11, 2024 and February 23, 2024. Notably, there is no mention of the prescribed pharmaceuticals in Dr. Friedman's examination report, yet the prescriptions were steered to Navar Pharmacy.

  o On December 8, 2023, two (2) prescriptions were allegedly issued to JQZ by Dr. Friedman for Lidothol 4.5-5% Patches and Vimovo with five refills for each pharmaceutical, which were dispensed by Navar Pharmacy on December 9, 2023, January 11, 2024 and February 23, 2024. Notably, there is no mention of the prescribed pharmaceuticals in Dr. Friedman's examination report, yet the prescriptions were steered to Navar Pharmacy.

  o On December 8, 2023, two (2) prescriptions were allegedly issued to GFZ by Dr. Friedman for Lidothol 4.5-5% Patches and Vimovo with five refills for each pharmaceutical, which were dispensed by Navar Pharmacy on December 9, 2023, January 11, 2024 and February 23, 2024. Notably, there is no mention of the prescribed pharmaceuticals in Dr. Friedman's examination report, yet the prescriptions were steered to Navar Pharmacy.

- On December 9, 2021, two Insureds – SDH and SE – were involved in the same motor vehicle accident. Thereafter, SDH and SE received, or allegedly received, examinations from Vyacheslav Mamanov N.P. ("NP Mamanov) of AHC Medical Services P.C. ("AHC Medical") at a No-Fault Clinic located at 175-20 Hillside Ave, Jamaica, New York. SDH and SE were in different physical conditions and experienced the impact from different positions in the vehicle. Nonetheless, SDH and SE were issued prescriptions for the same Fraudulent Pharmaceutical, which were dispensed by Navar Pharmacy. In particular:

  o On December 21, 2021, one day *after* a purported examination, a Fraudulent Prescription Form was allegedly issued to SDH by Dr. Chowdhury for Lidothol 4.5-5% Patches, which was dispensed by Navar Pharmacy on January 11, 2022.

Notably, the Fraudulent Prescription Form was issued using Dr. Chowdhury's name and medical license number despite the fact that NP Mamanov was the treating practitioner. Further, there is no mention of the prescribed pharmaceutical in NP Mamanov's examination report, yet the prescription was steered to Navar Pharmacy.

   o On December 21, 2021, one day *after* a purported examination, a Fraudulent Prescription Form was allegedly issued to SE by Dr. Chowdhury for Lidothol 4.5-5% Patches, which was dispensed by Navar Pharmacy on January 11, 2022. Notably, the Fraudulent Prescription Form was issued using Dr. Chowdhury's name and medical license number despite the fact that NP Mamanov was the treating practitioner. Further, there is no mention of the prescribed pharmaceutical in NP Mamanov's examination report, yet the prescription was steered to Navar Pharmacy.

   o On February 8, 2022, a Fraudulent Prescription Form was allegedly issued to SDH by Dr. Chowdhury for Lidothol 4.5-5% Patches, which was dispensed by Navar Pharmacy on February 13, 2022. Notably, there was no corresponding examination of SDH on that date by Dr. Chowdhury or any practitioner associated with AHC Medical. In fact, SDH only purportedly received an examination by AHC Medical on December 20, 2021.

   o On February 8, 2022, a Fraudulent Prescription Form was allegedly issued to SE by Dr. Chowdhury for Lidothol Patches, which was dispensed by Navar Pharmacy on February 13, 2022. Notably, there was no corresponding examination of SE on that date by Dr. Chowdhury or any practitioner associated with AHC Medical. In fact, SE only purportedly received an examination by AHC Medical on December 20, 2021.

• On January 4, 2022, two Insureds – PG and CH – were involved in the same motor vehicle accident. Thereafter, PG and CH allegedly received examinations from Dr. Bannerman of ACE Emergent Medical at the Merrick Blvd. Clinic.  PG and CH were in different physical conditions and experienced the impact from different positions in the vehicle.  Nonetheless, PG and CH were issued prescriptions for the same Fraudulent Pharmaceutical. In particular:

   o On January 5, 2022, a Fraudulent Prescription Form was allegedly issued to PG by Dr. Bannerman for Lidothol 4.5-5% Patches, which was dispensed by Navar Pharmacy on January 20, 2022.  Notably, there is no mention of the prescribed pharmaceutical in Dr. Bannerman's examination report, yet the prescription was steered to Navar Pharmacy.

   o On January 5, 2022, a Fraudulent Prescription Form was allegedly issued to CH by Dr. Bannerman for Lidothol 4.5-5% Patches, which was dispensed by Navar Pharmacy on January 20, 2022. Notably, there is no mention of the prescribed

31

pharmaceutical in Dr. Bannerman's examination report, yet the prescription was steered to Navar Pharmacy.

- o On February 10, 2022, a Fraudulent Prescription Form was allegedly issued to CH by Dr. Bannerman for Lidothol 4.5-5% Patches, which was dispensed by Navar Pharmacy on February 22, 2022. Notably, there is no mention of the prescribed pharmaceutical in Dr. Bannerman's examination report, yet the prescription was steered to Navar Pharmacy.

- o On March 8, 2022, a Fraudulent Prescription Form was allegedly issued to PG by Dr. Bannerman for Lidothol 4.5-5% Patches, which was dispensed by Navar Pharmacy on March 20, 2022. Notably, there is no mention of the prescribed pharmaceutical in Dr. Bannerman's examination report, yet the prescription was steered to Navar Pharmacy.

Moreover, the prescriptions purportedly issued to PG and CH by Dr. Bannerman were issued after Dr. Bannerman moved to California and ceased treating patients at the Merrick Blvd. Clinic.

- On November 24, 2021, two Insureds – JW and AD – were involved in the same motor vehicle accident. Thereafter, JW and AD received, or allegedly received, examinations from NP Mamanov of AHC Medical at a No-Fault Clinic located at 175-20 Hillside Avenue, Jamaica, New York. JW and AD were in different physical conditions and experienced the impact from different positions in the vehicle. Nonetheless, JW and AD were issued prescriptions for the same Fraudulent Pharmaceutical. In particular:

- o On January 17, 2022, more than 5 weeks *after* a purported examination, a Fraudulent Prescription Form was allegedly issued to JW by Dr. Chowdhury for Lidothol 4.5-5% Patches, which was dispensed by Navar Pharmacy on January 30, 2022. Notably, the Fraudulent Prescription Form was issued using Dr. Chowdhury's name and medical license number despite the fact that NP Mamanov was the treating practitioner.

- o On January 17, 2022, more than 5 weeks *after* a purported examination, a Fraudulent Prescription Form was allegedly issued to AD by Dr. Chowdhury for Lidothol 4.5-5% Patches, which was dispensed by Navar Pharmacy on February 2, 2022. Notably, the Fraudulent Prescription Form was issued using Dr. Chowdhury's name and medical license number despite the fact that NP Mamanov was the treating practitioner.

- o On February 16, 2022, a Fraudulent Prescription Form was allegedly issued to JW by Dr. Chowdhury for Lidothol 4.5-5% Patches, which was dispensed by March 3, 2022. Once again, the Fraudulent Prescription Form was issued using Dr. Chowdhury's name and medical license number despite the fact that NP Mamanov was the treating practitioner. Further, there was no corresponding

examination of JW on that date by Dr. Chowdhury or any practitioner associated with AHC Medical.

o On February 16, 2022, a Fraudulent Prescription Form was allegedly issued to AD by Dr. Chowdhury for Lidothol 4.5-5% Patches, which was dispensed by Navar Pharmacy on March 3, 2022. Once again, the Fraudulent Prescription Form was issued using Dr. Chowdhury's name and medical license number despite the fact that NP Mamanov was the treating practitioner. Further, there was no corresponding examination of AD on that date by Dr. Chowdhury or any practitioner associated with AHC Medical.

118. These are only representative examples.

119. In many of the claims identified in Exhibit "1", two or more Insureds who were involved in the same automobile accident received the same set of Fraudulent Pharmaceuticals dispensed and billed for by Navar Pharmacy, despite the fact that the Insureds were differently situated.

120. Notably, each year in the United States, approximately 4.5 million ambulatory care visits and 100,000 deaths occur because of adverse drug reactions. A substantial number of these adverse drug reactions are the result of improper prescription practices associated with therapeutic duplication. See, Mathew Witry, PharmD, PhD, Medication List Discrepancies and Therapeutic Duplications Among Dual Use Veterans, Federal Practitioner, 14 (September 2016).

121. Therapeutic duplication is the prescribing and dispensing of two or more drugs from the same therapeutic class – such as oral and topical NSAIDs (e.g., Naproxen and Diclofenac Sodium 2% Solution) – which puts the patient at greater risk of adverse drug reactions without providing any additional therapeutic benefit.

122. Nevertheless, Prescribers consciously issued multiple prescriptions for multiple Fraudulent Pharmaceuticals and the Defendants consciously dispensed Diclofenac products in conjunction with oral NSAIDs (e.g., Naproxen or Ibuprofen) to numerous Insureds, thereby

33

engaging in therapeutic duplication, despite the risks it posed to the Insureds' health and well-being.  For example:

- Insured RA was involved in a motor vehicle accident on April 20, 2024, and subsequently sought treatment with Imran Ashraf, M.D. ("Dr. Ashraf") of Hudson Pro Orthopaedics.  On May 15, 2024, Navar Pharmacy dispensed Diclofenac Sodium 2% Solution, Vimovo, and Lidothol 4.5-5% Patches to RA pursuant to prescriptions purportedly issued by PA Davydov on May 13, 2024 – despite the fact that Dr. Ashraf was the treating practitioner. Thereafter, on June 22, 2024, Navar Pharmacy dispensed refills of Diclofenac Sodium 2% Solution, Vimovo, and Lidothol 4.5-5% Patches to RA pursuant to PA Davydov's purported prescriptions issued on May 13, 2024. Notably, there is no mention of the prescribed pharmaceuticals in Dr. Ashraf's examination report. Moreover, the simultaneous dispensing of Diclofenac Sodium 2% Solution and Vimovo, which contains the NSAID Naproxen, constitutes therapeutic duplication and exposed Insured RA to increased risks.

- Insured LB was involved in a motor vehicle accident on May 31, 2023, and subsequently sought treatment with Dr. Krishna of Total Neuro Care.  On August 19, 2023, Navar Pharmacy dispensed Diclofenac Sodium 2% Solution, Ibuprofen-Famotidine (brand name: Duexis), and Lidothol 4.5-5% Patches to LB pursuant to prescriptions purportedly issued by Dr. Krishna on August 17, 2023. Thereafter, on September 20, 2023, Navar Pharmacy dispensed refills of Diclofenac Sodium 2% Solution, Ibuprofen-Famotidine, and Lidothol 4.5-5% Patches to LB pursuant to Dr. Krishna's purported prescriptions issued on August 17, 2023. Notably, the simultaneous dispensing of Diclofenac Sodium 2% Solution and Ibuprofen-Famotidine constitutes therapeutic duplication and exposed Insured LB to increased risks.

- Insured PB was involved in a motor vehicle accident on July 28, 2023, and subsequently sought treatment with Dr. Krishna of Total Neuro Care. On September 15, 2023, Navar Pharmacy dispensed Diclofenac Sodium 2% Solution, Vimovo, and Lidothol 4.5-5% Patches to PB pursuant to prescriptions purportedly issued by Dr. Krishna on September 13, 2023 – two days *after* the purported examination of PB. Thereafter, on October 17, 2023, Navar Pharmacy dispensed refills of Diclofenac Sodium 2% Solution, Vimovo, and Lidothol 4.5-5% Patches to PB pursuant to Dr. Krishna's purported prescriptions issued on September 13, 2023.  Notably, there is no mention of the prescribed pharmaceuticals in Dr. Krishna's examination report. Moreover, the simultaneous dispensing of Diclofenac Sodium 2% Solution and Vimovo, which contains the NSAID Naproxen, constitutes therapeutic duplication and exposed Insured PB to increased risks.

- Insured JC was involved in a motor vehicle accident on August 13, 2023, and subsequently sought treatment with PA Davydov of Hudson Pro Orthopaedics.  On April 15, 2024, Navar Pharmacy dispensed Diclofenac Sodium 2% Solution, Vimovo, and Lidothol 4.5-5% Patches to JC pursuant to prescriptions purportedly issued by PA Davydov on April 12, 2024.  Thereafter, on May 14, 2024, Navar Pharmacy dispensed

refills of Diclofenac Sodium 2% Solution, Vimovo, and Lidothol 4.5-5% Patches to JC pursuant to PA Davydov's purported prescriptions issued on April 12, 2024. PA Davydov's examination only documented that JC was to receive a prescription for an inflammatory but failed to document the prescribed pharmaceuticals. Moreover, the simultaneous dispensing of Diclofenac Sodium 2% Solution and Vimovo, which contains the NSAID Naproxen, constitutes therapeutic duplication and exposed Insured JC to increased risks.

- Insured MK was involved in a motor vehicle accident on July 1, 2023, and subsequently sought treatment with Dr. Krishna of Westchester Medical. On April 20, 2024, Navar Pharmacy dispensed Diclofenac Sodium 2% Solution, Vimovo and Lidothol 4.5-5% Patches to MK pursuant to prescriptions purportedly issued by Dr. Krishna on April 18, 2024 – one day *after* the purported examination of MK. Thereafter, on May 25, 2024, Navar Pharmacy dispensed refills of Diclofenac Sodium 2% Solution, Vimovo, and Lidothol 4.5-5% Patches to MK pursuant to Dr. Krishna's purported prescriptions issued on April 18, 2024. Notably, there is no mention of the prescribed pharmaceuticals in Dr. Krishna's examination report. In fact, the examination report from Dr. Krishna on April 17, 2024 only documented the prescription of Mobic, Flexeril, and Neurontin, and yet, prescriptions for Diclofenac Sodium 2% Solution, Vimovo and Lidothol 4.5-5% Patches were steered to Navar Pharmacy. Moreover, the simultaneous dispensing of Diclofenac Sodium 2% Solution and Vimovo, which contains the NSAID Naproxen, constitutes therapeutic duplication and exposed Insured MK to increased risks.

- Insured RJ was involved in a motor vehicle accident on November 1, 2022, and subsequently sought treatment with Dr. Krishna of Total Neuro Care. On June 20, 2023, Navar Pharmacy dispensed Diclona Gel, Ibuprofen-Famotidine (brand name: Duexis), and Lidothol 4.5-5% Patches to RJ pursuant to prescriptions purportedly issued by Dr. Krishna on June 16, 2023. Thereafter, on July 22, 2023, Navar Pharmacy dispensed refills of Diclona Gel, Ibuprofen-Famotidine, and Lidothol 4.5-5% Patches to RJ pursuant Dr. Krishna's purported prescriptions issued on June 16, 2023. Notably, the simultaneous dispensing of Diclona Gel and Ibuprofen-Famotidine constitutes therapeutic duplication and exposed Insured RJ to increased risks.

- Insured CH was involved in a motor vehicle accident on May 27, 2023, and subsequently sought treatment with Dr. Krishna of Total Neuro Care, P.C. On September 12, 2023, Navar Pharmacy dispensed Diclofenac Sodium 2% Solution, Ibuprofen-Famotidine (brand name: Duexis), and Lidothol 4.5-5% Patches to CH pursuant to prescriptions purportedly issued by Dr. Krishna on August 18, 2023 – one day *after* the purported examination of CH. Thereafter, on October 9, 2023, Navar Pharmacy dispensed refills of Diclofenac 2% Solution, Ibuprofen-Famotidine, and Lidothol 4.5-5% Patches to CH pursuant to Dr. Krishna's purported prescriptions issued on August 18, 2023. Notably, there is no mention of the prescribed pharmaceuticals in Dr. Krishna's examination report. Moreover, the simultaneous dispensing of Diclofenac Sodium 2% Solution and Ibuprofen-Famotidine, constitutes therapeutic duplication and exposed Insured CH to increased risks.

- Insured CC was involved in a motor vehicle accident on September 20, 2022, and subsequently sought treatment with Dr. Krishna of Westchester Medical.  On October 6, 2023, Navar Pharmacy dispensed Diclofenac Sodium 2% Solution, Ibuprofen-Famotidine (brand name: Duexis), and Lidothol 4.5-5% Patches to CC pursuant to prescriptions purportedly issued by Dr. Krishna on October 5, 2023 – one day *after* the purported examination of CC. Thereafter, on November 18, 2023, Navar Pharmacy dispensed refills of Diclofenac Sodium 2% Solution, Ibuprofen-Famotidine, and Lidothol 4.5-5% Patches to CC pursuant to Dr. Krishna's purported prescriptions issued on October 5, 2023. Notably, there is no mention of the prescribed pharmaceuticals in Dr. Krishna's examination report. Moreover, the simultaneous dispensing of Diclofenac Sodium 2% Solution and Ibuprofen-Famotidine constitutes therapeutic duplication and exposed Insured CC to increased risks.

- Insured ST was involved in a motor vehicle accident on July 10, 2023, and subsequently sought treatment with Dr. Krishna of Westchester Medical. On December 1, 2023, Navar Pharmacy dispensed Diclofenac Sodium 2% Solution, Vimovo, and Lidothol 4.5-5% Patches to ST pursuant to prescriptions purportedly issued by Dr. Krishna on November 30, 2023 – fifteen (15) days *after* the purported examination of ST.  Thereafter, on January 4, 2024, Navar Pharmacy dispensed refills of Diclofenac Sodium 2% Solution, Vimovo, and Lidothol 4.5-5% Patches to ST pursuant to Dr. Krishna's purported prescriptions issued on November 30, 2023.  Notably, there is no mention of the prescribed pharmaceuticals in Dr. Krishna's examination report. Moreover, the simultaneous dispensing of Diclofenac Sodium 2% Solution and Vimovo, which contains the NSAID Naproxen, constitutes therapeutic duplication and exposed Insured ST to increased risks.

- Insured RM was involved in a motor vehicle accident on March 5, 2024, and subsequently sought treatment with Dr. Ashraf of Hudson Pro Orthopaedics.  On March 30, 2024, Navar Pharmacy dispensed Diclona Gel, Vimovo, and Lidothol 4.5-5% Patches to RM pursuant to prescriptions purportedly issued by PA Davydov on March 19, 2024 – one day *after* the purported examination of RM, despite the fact that Dr. Ashraf was the treating provider. Thereafter, on May 3, 2024, Navar Pharmacy dispensed refills of Diclona Gel, Vimovo, and Lidothol 4.5-5% Patches to RM pursuant to PA Davydov's purported prescriptions issued on March 19, 2024.  Notably, there is no documentation of the prescribed pharmaceuticals in Dr. Ashraf's examination report.  Moreover, the simultaneous dispensing of Diclona Gel and Vimovo, which contains the NSAID Naproxen, constitutes therapeutic duplication and exposed Insured RM to increased risks.

123.    These are only representative examples.  In many of the claims identified in Exhibit "1", the Defendants dispensed Fraudulent Pharmaceuticals to Insureds that constitutes therapeutic duplication and exposed patients to increased risks.

36

124. Even so, pursuant to fraudulent, predetermined treatment protocols and collusive arrangements, and as demonstrated herein, the Prescribers prescribed, and Navar Pharmacy dispensed voluminous, excessive amounts of medically unnecessary pharmaceuticals, without regard to individualized, genuine patient care and safety.

### C. The Fraudulent Topical Pain Products

125. In accordance with the fraudulent scheme discussed above, and despite the best practices outlined above, Navar Pharmacy routinely billed GEICO for exorbitantly priced topical pain gels, ointments, and lotions, overwhelmingly in the form of Lidothol 4.5-5% Patches, Diclofenac Sodium 2% Solution, and Diclona Gel, pursuant to duplicitous, invalid and/or unauthorized prescriptions solicited from Prescribers and Clinic Controllers in exchange for kickbacks or other financial incentives.

#### a. The Unapproved Topical Products

126. In keeping with the fact that the Defendants, Prescribers, and Clinic Controllers acted pursuant to fraudulent treatment protocols designed to maximize profits, and with gross indifference to patient care and safety, the Defendants obtained voluminous prescriptions and submitted over $1.8 million in claims to GEICO for unapproved drugs produced or packaged by an unregistered supplier.

127. The United States Federal Food, Drug, and Cosmetic Act ("FDCA") authorizes the FDA to oversee the safety of food, drugs, and cosmetics.

128. The FDA strictly regulates over-the-counter and prescription drugs, and oversees drug manufacturing in several ways, including testing drugs and routinely inspecting drug manufacturing plants and outsourcing facilities engaged in the compounding of drugs.

129.    Federal law requires all new drugs in the U.S. be shown to be safe and effective for their intended use prior to marketing.  The FDA makes clear that unapproved drugs pose significant risks to patients because they have not been reviewed by the FDA for safety, effectiveness, or quality.  Without FDA review, there is no way to know if these drugs are safe and effective for their intended use, manufactured in a way that ensures consistent drug quality, or whether their label is complete and accurate.

130.    Nevertheless, Navar Pharmacy billed GEICO over $1.8 million for dispensing purported pharmaceutical pain patches and topical gels to GEICO Insureds denominated as "Lidothol 4.5%-5% Patches", "Lidothol 4%-1% Patches" and "Diclona Gel 1.25%-4.5%" (i.e., Diclona Gel) (collectively, the Unapproved Topical Products).

131.    The FDA considers Lidothol 4.5%-5% Patches, Lidothol 4%-1% Patches and Diclona Gel to be unapproved drugs.

132.    Unapproved prescription drugs are only allowed to be marketed in limited circumstances, such as if the drug is subject to an open drug efficacy study or if health care professionals rely on the drug to treat serious medical conditions when there is no FDA-approved drug to treat that condition. See e.g., https://www.fda.gov/drugs/enforcement-activities-fda/unapproved-drugs.  No exception applies to Lidothol 4.5%-5% Patches, Lidothol 4%-1% Patches or Diclona Gel that might allow them to be marketed as prescription drug products.

133.    Moreover, Navar Pharmacy, as a pharmacy licensed in New York State, is prohibited from holding for sale or selling drugs that are sourced from drug suppliers not licensed in New York State, as there is no way to ensure that the drugs were manufactured in accordance with the good manufacturing practices specified in Parts 210 and 211 of Title 21, Code of Federal Regulations.

134.    The Lidothol 4%-1% Patches dispensed and billed by the Defendants through Navar Pharmacy were purchased or sourced from Clinic Pharma.

135.    Clinic Pharma is <u>not</u> a registered drug supplier, manufacturer, or wholesaler with the New York State Education Department, as required by the pharmacy law, and therefore, is not legally permitted to dispense, retail, wholesale, manufacturer or offer drugs for sale in New York.

136.    Further, all the Lidothol 4.5%-5% Patches and Diclona Gel dispensed and billed by the Defendants through Navar Pharmacy were purchased or sourced from Terrain Pharmaceuticals, LLC ("Terrain Pharmaceuticals").

137.    Until on or about December 17, 2024, Terrain Pharmaceuticals was <u>not</u> a registered drug supplier, manufacturer, or wholesaler with the New York State Education Department, as required by the pharmacy law, and therefore, was not legally permitted to dispense, retail, wholesale, manufacturer or offer drugs for sale in New York.

138.    Yet, from December 2021 through November 2024, the Defendants purchased or sourced Lidothol 4.5%-5% Patches and Diclona Gel from Terrain Pharmaceuticals despite the fact that it was not licensed to operate in New York, and resulting in more than $1.5 million in billing to GEICO.

139.    Navar Pharmacy, as noted above, is prohibited from selling drugs that are purchased from drug suppliers not licensed in New York and from holding for sale or selling Lidothol 4%-1% Patches purchased from Clinic Pharma.

140.    Likewise, Navar Pharmacy was prohibited from selling drugs and from holding for sale or selling Lidothol 4.5%-5% Patches and Diclona Gel purchased from Terrain Pharmaceuticals during the time period that it was not licensed in New York.

141. To the extent that the Defendants somehow circumvented purchasing Lidothol 4.5%-5% Patches, Lidothol 4%-1% Patches and Diclona Gel directly from an unlicensed supplier, the patches and gel remain "unapproved" drugs, and no legitimate pharmacy owner would purchase and dispense as prescription drugs large volumes of unapproved drugs not reviewed by the FDA.

142. Similarly, no legitimate physician or healthcare provider would issue prescriptions for unapproved drugs like Lidothol 4.5%-5% Patches, Lidothol 4%-1% Patches and Diclona Gel, particularly since there are numerous other FDA-approved drugs available that the physician or healthcare provider could prescribe without any out of the ordinary risk to the patient.

143. In short, the Defendants obtained prescriptions and dispensed and billed for "unapproved" drugs through Navar Pharmacy without any way to know if the drugs are safe and effective, manufactured in a way that ensured consistent drug quality, or contained complete and accurate labeling – solely to exploit the patients for financial gain, without regard for genuine patient care.

144. The Prescribers never recommended the Insureds first use over-the-counter lidocaine or diclofenac products – which are FDA-approved and available to treat their often acute, minor strain/sprain injuries.

145. Further, the initial examination reports prepared by the Prescribers virtually never set forth the medical basis for the prescriptions and routinely failed to acknowledge that the patient was even being prescribed the Unapproved Topical Products.

146. Likewise, the follow-up examination reports virtually never addressed whether the Unapproved Topical Products prescribed provided any pain relief to the patient or were otherwise

effective for the purpose prescribed, to what degree, or whether the patients experienced any side effects.

147. Nonetheless, in keeping with the Defendants' profit driven fraudulent scheme, the Prescribers and Clinic Controllers issued excessive amounts of medically unnecessary prescriptions for the Unapproved Topical Products, in conjunction with other Fraudulent Pharmaceuticals. For example:

- Insured EG was allegedly involved in an automobile accident on December 11, 2023. Subsequently, EG sought treatment with PA Davydov of Hudson Pro Orthopaedics, and underwent an examination with PA Davydov on February 26, 2024. PA Davydov's examination report only documented that EG was to "start anti-inflammatory medications" but failed to document the prescribed pharmaceuticals. Nonetheless, on February 28, 2024, Navar Pharmacy dispensed Diclona Gel, Lidothol 4.5-5% Patches and Vimovo to EG pursuant to prescriptions purportedly issued by PA Davydov on February 26, 2024. Thereafter, Navar Pharmacy dispensed (i) refills of Diclona Gel and Lidothol 4.5-5% Patches on March 27, 2024 pursuant to PA Davydov's purported prescriptions issued on February 26, 2024 and Vimovo pursuant to a prescription purportedly issued by PA Davydov on March 25, 2024; (ii) refills of Diclona Gel and Vimovo on May 2, 2024 pursuant to PA Davydov's purported prescriptions issued on March 25, 2024 and Lidothol 4.5-5% Patches pursuant to a prescription purportedly issued by PA Davydov on April 28, 2024; and (iii) a refill of Diclona Gel pursuant to PA Davydov's purported prescription issued on March 25, 2024 and Lidothol 4.5-5% Patches pursuant to a prescription purportedly issued by PA Davydov on June 17, 2024. Notably, there is no documentation of any of the aforementioned prescribed pharmaceuticals in PA Davydov's examination reports.

- Insured AA was allegedly involved in an automobile accident on March 8, 2023. Subsequently, AA sought treatment with PA Davydov of Hudson Pro Orthopaedics at a No-Fault Clinic located at 1515 Church Avenue, Brooklyn, New York, and underwent an examination with PA Davydov on April 12, 2024. Notably, there is no documentation of any prescribed pharmaceuticals in PA Davydov's examination report. Despite this, on April 16, 2024, Navar Pharmacy dispensed Lidothol 4.5-5% Patches, Diclona Gel, and Vimovo to AA pursuant to prescriptions purportedly issued by PA Davydov on April 12, 2024, with one refill for each pharmaceutical. On June 11, 2024, Navar Pharmacy dispensed refills of Lidothol 4.5-5% Patches, Diclona Gel, and Vimovo pursuant to PA Davydov's purported prescriptions.

- Insured GA was allegedly involved in an automobile accident on September 15, 2023. Subsequently, GA sought treatment with Dr. Krishna of Westchester Medical at the Wilkinson Ave Clinic, and underwent an examination with Dr. Krishna on October 30, 2023. Notably, there is no documentation of any prescribed pharmaceuticals in Dr.

Krishna's examination report. Despite this, on November 4, 2023, Navar Pharmacy dispensed Lidothol 4.5-5% Patches and Diclona Gel to GA pursuant to prescriptions purportedly issued by Dr. Krishna on October 31, 2023 – one day *after* the purported examination of GA.  On December 5, 2023, Navar Pharmacy dispensed refills of Lidothol 4.5-5% Patches and Diclona Gel pursuant to Dr. Krishna's purported prescriptions.

- Insured MC was allegedly involved in an automobile accident on August 19, 2023. Subsequently, MC sought treatment with Dr. Krishna of Westchester Medical at the Wilkinson Ave Clinic and underwent an examination with Dr. Krishna on January 10, 2024. Notably, there is no documentation of any prescribed pharmaceuticals in Dr. Krishna's examination report.  Despite this, on January 12, 2024, Navar Pharmacy dispensed and billed for Lidothol 4.5-5% Patches and Diclona Gel pursuant to prescriptions purportedly issued by Dr. Krishna on January 11, 2024 – one day *after* the purported examination of MC – with one refill for each pharmaceutical. On February 13, 2024, Navar Pharmacy dispensed refills of Lidothol 4.5-5% Patches and Diclona Gel pursuant to Dr. Krishna's purported prescriptions.  On April 10, 2024, MC underwent another examination with Dr. Krishna who failed to document any prescribed pharmaceuticals in his examination report. Despite this, on May 9, 2024, Navar Pharmacy once again dispensed Lidothol 4.5-5% Patches and Diclona Gel pursuant to prescriptions purportedly issued by Dr. Krishna on May 7, 2024 – 28 days after the purported examination of MC.  On June 22, 2024, Navar Pharmacy dispensed refills of Lidothol 4.5-5% Patches and Diclona Gel pursuant to Dr. Krishna's purported prescriptions.

- Insured GMD was allegedly involved in an automobile accident on June 15, 2023. Subsequently, GMD sought treatment with Dr. Krishna of Total Neuro Care at the Voorhies Ave Clinic and underwent an examination with Dr. Krishna on September 26, 2023.  Dr. Krishna's examination report documented that GMD was to "continue medications" but failed to document any prescribed pharmaceuticals. Despite this, on September 30, 2023, Navar Pharmacy dispensed Lidothol 4.5-5% Patches and Diclona Gel pursuant to prescriptions purportedly issued by Dr. Krishna on September 27, 2023 – one day *after* the purported examination of GMD.

148.    These are only representative examples.  In many of the claims identified in Exhibit "1", the Prescribers and Clinic Controllers routinely steered excessive amounts of duplicitous and medically unnecessary prescriptions to Navar Pharmacy – with exorbitant charges often amounting to thousands of dollars per patient on multiple dates – in conjunction with other Fraudulent Pharmaceuticals.

149. The Defendants' billing to GEICO for Lidothol 4.5-5% Patches typically resulted in charges of $3,015.41 or $2,816.35 per prescription and, to-date, the Defendants have submitted over $1,270,900.00 in pharmaceutical billing to GEICO for this Unapproved Topical Product.

150. The Defendants' billing to GEICO for Lidothol 4%-1% Patches typically resulted in a charge of $2,741.28 per prescription and, to-date, the Defendants have submitted over $245,300.00 in pharmaceutical billing to GEICO for this Unapproved Topical Product.

151. The Defendants' billing to GEICO for Diclona Gel typically resulted in a charge of $2,064.74 per prescription and, to-date, the Defendants have submitted over $296,000.00 in pharmaceutical billing to GEICO for this Unapproved Topical Product.

152. By purchasing cheap, unapproved drugs sourced from unapproved suppliers – and then dispensing those drugs in large volumes to Insureds – the Defendants endangered patients and violated material regulatory and licensing requirements imposed on pharmacies in New York, while generating huge profits from the fraudulent claims submitted to the New York automobile insurance industry.

153. The Defendants' excessive billing coupled with the Prescribers failure to properly document the prescriptions for the Unapproved Topical Products, or the Insureds' use of this medication, further indicates that there was no legitimate medical reason for the Prescribers to have prescribed large volumes of Unapproved Topical Products to the Insureds, or for the Defendants to have dispensed such large volumes to the Insureds, particularly given the potential for adverse health effects and the availability of comparably effective and less-costly over-the-counter and FDA approved alternatives.

b. The Diclofenac and Lidocaine Products

154. In addition to the excessive amounts of Unapproved Topical Products dispensed by Navar Pharmacy, the Defendants also routinely billed GEICO for exorbitantly priced diclofenac sodium topical products i.e., Diclofenac Sodium 2% Solution and Diclofenac Sodium Gel 3% (the "Topical Diclofenac Products"), pursuant to prescriptions solicited from Prescribers and Clinic Controllers.

155. As with the Unapproved Topical Products, the Defendants solicited the Prescribers and the Clinic Controllers to provide them with prescriptions for the Topical Diclofenac Products so they could bill for these pharmaceutical products at exorbitant charges, which further inflated the charges submitted to GEICO and other New York No-Fault insurers.

156. The FDA requires that diclofenac sodium prescriptions contain a "Black Box Warning" indicating serious cardiovascular and gastrointestinal risks.

157. The "Black Box Warning" warning is the strictest warning attached to the labeling of a prescription drug or product by the FDA and is designed to call attention to serious or life-threatening risks associated with the drug or product.

158. Specifically, with every diclofenac sodium prescription, the FDA requires the patient be warned that: (i) diclofenac sodium may cause an increased risk of serious cardiovascular thrombotic events, including myocardial infarction, and stroke, which can be fatal; and (ii) diclofenac sodium may cause an increased risk of serious gastrointestinal adverse events including bleeding, ulceration, and perforation of the stomach or intestines, which can be fatal.

159. Diclofenac Sodium 2% Solution – one of the two diclofenac sodium topical products prescribed by the Prescribers and dispensed by the Defendants – is a topical NSAID that is only indicated to treat pain caused by osteoarthritis of the knees.

160.    Despite the FDA approved indications for the prescription and use of Diclofenac Sodium 2% Solution, the Prescribers prescribed, and the Defendants dispensed excessive amounts of Diclofenac Sodium 2% Solution to Insureds with no documented medical history of osteoarthritis of the knees.

161.    Diclofenac Sodium Gel 3%, another diclofenac sodium topical product dispensed and billed by the Defendant through Navar Pharmacy, is only FDA approved to treat a precancerous skin condition known as actinic keratosis and does not have any proven efficacy or safety in the treatment of musculoskeletal injuries such as sprains or strains, nor is the use of topical diclofenac to treat musculoskeletal injuries an accepted "off-label" use.

162.    In fact, with respect to treating acute pain (e.g., from strains, sprains, contusions, or overuse injuries), clinical studies of topical NSAIDs approved by the FDA such as topical diclofenac 1% have shown they are no more effective than a placebo. Further, there are no clinical studies to support the use of Diclofenac Sodium Gel 3% for the treatment of acute pain and no evidence that topical diclofenac in concentrations of 3% is any more effective than topical diclofenac in concentrations of 1% – which is available over-the-counter at a fraction of the cost.

163.     Yes, Prescribers prescribed, and the Defendants dispensed, Diclofenac Sodium Gel 3% to Insureds with no documented history of actinic keratosis or any precancerous skin conditions.

164.    In keeping with the fact that Topical Diclofenac Products were prescribed and dispensed pursuant to predetermined treatment protocols and without regard for patient care and safety, the examination reports prepared by the Prescribers virtually never stated the medical basis for the prescriptions.

165.    Moreover, the Prescribers' follow-up examination reports virtually never addressed whether the Topical Diclofenac Products prescribed provided any pain relief to the patient or was otherwise effective for the purpose prescribed, to what degree, or whether the patients experienced any side effects.

166.    Notwithstanding the FDA approved uses for the Topical Diclofenac Products, or the risks associated with diclofenac sodium prescriptions, the Prescribers steered voluminous prescriptions to Navar Pharmacy for the Topical Diclofenac Products, and the Defendants dispensed and billed for these products in excessive amounts, pursuant to predetermined fraudulent protocols and collusive arrangements, without any genuine regard for patient care or safety,  or the commercial availability of a wide range of FDA-approved medications, as well as over-the-counter medications, proven to have therapeutic effects and available at a fraction of the cost.

167.    The Defendants submitted exorbitant charges to GEICO typically amounting to $2,149.50 per prescription of Diclofenac Sodium 2% Solution; and $1,888.00 per prescription of Diclofenac Sodium Gel 3%.

168.    Pursuant to their fraudulent scheme, the Defendants' billing to GEICO for Topical Diclofenac Products has exceeded $572,600.00.

169.    The Defendants, in some instances, also billed for and dispensed exorbitantly-priced Lidocaine 5% Ointment pursuant to prescriptions solicited from the Prescribers and the Clinic Controllers, in exchange for kickbacks or other financial incentives.

170.    Lidocaine is a local anesthetic (numbing medication) that works by blocking nerve signals in the body. Lidocaine 5% Ointment is primarily indicated for temporary pain relief associated with minor burns and skin irritations such as sunburn, insect bites, poison ivy, poison oak, poison sumac, abrasions of the skin and insect bites, or as a topical anesthetic for minor

procedures such as sutures or injections. Notably, Lidocaine does not penetrate the skin enough to treat deep musculoskeletal pain.

171.   Excessive dosage or short intervals between doses of Lidocaine 5% Ointment can cause serious adverse effects including, among others, bradycardia, hypotension, and cardiovascular collapse that may lead to cardiac arrest.  Accordingly, patients should be instructed to strictly adhere to the recommended dosage and a single application of Lidocaine 5% Ointment should not exceed 5 grams.

172.   The NYS WCB's published guidelines stressed the risks of adverse side effects associated with topical pain medications such as lidocaine, by specifically stating that "topical agent[s] should be prescribed with strict instructions for application and maximum number of applications per day to obtain the desired benefit and avoid potential toxicity." See NYS WCB Medical Treatment Guidelines, Mid and Lower Back Injury (May 2022, p. 38); NYS WCB Medical Treatment Guidelines, Mid and Lower Back Injury (May 2022, p. 34).  However, the Prescribers routinely failed to indicate the maximum dosage on any prescriptions for Lidocaine 5% Ointment.

173.   Notably, Lidocaine ointments and patches with 4% Lidocaine are available over-the-counter and have a similar efficacy as Lidocaine 5% Ointment at a fraction of the cost.

174.   Over-the-counter products such as Icy Hot Lidocaine which contains 4% Lidocaine, are available at most well-known pharmacy retailers such as Rite-Aid and Target for advertised prices in the range of $10.

175.   Despite this, the Prescribers never recommended Insureds first use over-the-counter lidocaine products to treat their minor aches and pains sustained in fender-bender type motor vehicle accidents. Rather, pursuant to collusive arrangements and predetermined protocols, the

Prescribers prescribed Insureds Lidocaine 5% Ointment and directed the prescriptions to Navar Pharmacy, typically billing $1,522.50 to $1,5524.00 per prescription.

### D.        The Fraudulent Vimovo Products

176.    As demonstrated herein, in order to further inflate the charges and maximize their profits, the Defendants regularly dispensed and billed for an exorbitantly priced oral pain reliever, i.e., Vimovo Products, in conjunction with the Fraudulent Topical Pain Products, pursuant to duplicitous, invalid and/or unauthorized prescriptions solicited from Prescribers and Clinic Controllers.

177.    Vimovo is a multi-ingredient oral medication containing naproxen, a nonsteroidal anti-inflammatory drug, and esomeprazole, a proton-pump inhibitor ("PPI").  Vimovo is only FDA approved to treat symptoms relating to osteoarthritis, rheumatoid arthritis, and ankylosing spondylitis in patients, and to decrease the risk of developing NSAID-related gastric ulcers. However, the FDA indicates that Vimovo should not be used as the first course of treatment for acute pain.

178.    Moreover, the American College of Gastroenterology has published guidelines that indicate certain risk factors that puts patients at an increased risk of NSAID-related gastrointestinal injuries, thereby necessitating a PPI like esomeprazole.  For example, a patient's prior medical history of complicated ulcers or patients over the age of 65 years old are at increased risk for NSAID-related injury.

179.    Nevertheless, the Defendants steered the Prescribers and Clinic Controllers to prescribe the exorbitantly-priced Vimovo Products to GEICO's Insureds – typically billed at $2,144.64 for each prescription – often along with and in addition to *a multitude of other*

*Fraudulent Topical Pain Products,* to maximize Defendants' profits without regard for genuine patient care.

180. In keeping with the Defendants' fraudulent scheme, the Prescribers often failed to document in their examination reports that the patient was prescribed Vimovo Products.

181. Likewise, the follow-up examination reports virtually never addressed whether the Vimovo Products prescribed provided any relief to the patient or was otherwise effective for the purpose prescribed, to what degree, or whether the patients experienced any side effects.

182. Notably, each of the ingredients contained in Vimovo Products are available over-the-counter without a prescription at a fraction of the cost.

183. Nonetheless, in keeping with the Defendants' profit driven fraudulent scheme, the Prescribers and Clinic Controllers issued excessive amounts of prescriptions for Vimovo Products in conjunction with other Fraudulent Pharmaceuticals pursuant to collusive arrangements and without regard to genuine care.  For example:

- Insured LL was allegedly involved in an automobile accident on January 2, 2023 and subsequently sought treatment with PA Davydov of Hudson Pro Orthopedics at a No-Fault Clinic located at 1515 Church Avenue, Brooklyn, New York.  On May 24, 2024, LL underwent an examination with PA Davydov who only documented that LL was to "start anti-inflammatory medications" but failed to document any prescribed pharmaceuticals. On May 25, 2024, Navar Pharmacy dispensed *Vimovo, Diclona Gel, and Lidothol 4.5-5% Patches* pursuant to prescriptions purportedly issued by PA Davydov on May 24, 2024. Thereafter, on July 5, 2024, Navar Pharmacy dispensed refills of *Vimovo, Diclona Gel, and Lidothol 4.5-5% Patches* pursuant to PA Davydov's purported prescriptions issued on May 24, 2024. Navar Pharmacy's charges to GEICO for these products totaled $15,074.18.

- Insured JR was allegedly involved in an automobile accident on August 25, 2023 and subsequently sought treat with PA Davydov of Hudson Pro Orthopaedics at a No-Fault Clinic located at 1515 Church Avenue, Brooklyn, New York.  On April 8, 2024, JR underwent an examination with PA Davydov who only documented that the patient was to "start anti-inflammatory medications" but failed to document any prescribed pharmaceuticals. On April 16, 2024, Navar Pharmacy dispensed *Vimovo, Lidothol 4.5-5% Patches, and Diclona Gel* pursuant to prescriptions purportedly issued by PA Davydov on April 8, 2024. Thereafter, on May 18, 2024, Navar Pharmacy dispensed

refills of *Vimovo, Lidothol 4.5-5% Patches, and Diclona Gel* pursuant to PA Davydov's purported prescriptions issued on April 8, 2024. Further, on June 19, 2024, Navar Pharmacy once again dispensed *Vimovo, Lidothol 4.5-5% Patches, and Diclona Gel* pursuant to PA Davydov's purported prescriptions issued on June 3, 2024. Notably, there was no examination of JR by PA Davydov on June 3, 2024. Navar Pharmacy's charges to GEICO for these products totaled $21,415.24.

- Insured SH was allegedly involved in an automobile accident on October 3, 2023 and subsequently sought treatment with Dr. Krishna of Total Neuro Care, P.C. On November 16, 2023, SH underwent an examination with Dr. Krishna. On November 24, 2023, Navar Pharmacy dispensed and billed for *Vimovo, Diclona Gel, and Lidothol 4.5-5% Patches* pursuant to prescriptions purportedly issued by Dr. Krishna on November 22, 2023 – six (6) days *after* Dr. Krishna's examination of SH. Thereafter, on December 28, 2023, Navar Pharmacy dispensed refills of *Vimovo, Diclona Gel, and Lidothol 4.5-5% Patches* pursuant to Dr. Krishna's purported prescriptions issued on November 22, 2023. Navar Pharmacy's charges to GEICO for these products totaled $14,056.75

- Insured JQA was allegedly involved in an automobile accident on July 14, 2023 and subsequently sought treatment with Dr. Krishna of Westchester Medical Care, P.C. On November 3, 2023, JQA underwent an examination with Dr. Krishna who only documented the prescription of Mobic and Neurontin. Despite this, on November 8, 2023, Navar Pharmacy dispensed *Vimovo, Lidothol Patches, and Diclofenac Sodium 2% Solution* pursuant to prescriptions purportedly issued by Dr. Krishna on November 6, 2023 – three (3) days *after* Dr. Krishna's examination of JOA. Thereafter, on December 6, 2023, Navar Pharmacy dispensed refills of *Vimovo, Lidothol 4.5-5% Patches, and Diclofenac Sodium 2% Solution* pursuant to Dr. Krishna's purported prescriptions issued on November 6, 2023. Navar Pharmacy's charges to GEICO for these products totaled $13,833.44.

184. These are only representative examples. At times, Navar Pharmacy dispensed, or purported to dispense, the Vimovo Products multiple times along with multiple other Fraudulent Pharmaceuticals to each Insured, where the charges to GEICO for each single Insured exceeded twenty-thousand ($20,000.00) dollars. For example, for Insured AMS, the charges to GEICO for the pharmaceuticals totaled $21,674.37; for Insured AABS, the charges to GEICO for the pharmaceuticals totaled $36,123.95; for Insured JBC, the charges to GEICO for the pharmaceuticals totaled $28,719.94.; for Insured EG, the charges to GEICO for the pharmaceuticals totaled $26,490.39; for Insured ALP, the charges to GEICO for the

pharmaceuticals totaled $20,897.00; and for Insured  JR, the charges to GEICO for the pharmaceuticals totaled $21,415.24.

185.    Defendants' billing of exorbitant sums for Fraudulent Pharmaceuticals, including the Vimovo Products, not only inflated the charges submitted to GEICO and other insurers without regard to genuine patient care, but significantly reduced the $50,000.00 in New York No-Fault benefits available to the Insureds that they may need for legitimate, medically necessary healthcare services.

186.    To date, the Defendants have submitted more than $418,000.00 in claims to GEICO through Navar Pharmacy seeking reimbursement for the Vimovo Products.

**E.    The Exploiting of Patients for Financial Gain Through the Illegal, Collusive Arrangements Among the Defendants, Prescribers and Clinic Controllers**

187.    To effectuate the fraudulent scheme, the Defendants steered the Prescribers and Clinic Controllers to routinely prescribe and direct prescriptions to Navar Pharmacy for large volumes of the specifically targeted Fraudulent Pharmaceuticals (i.e., the Fraudulent Topical Pain Products and Vimovo Products) pursuant to their collusive arrangements, which egregiously inflated the charges submitted to GEICO.

188.    New York's statutory framework provides, among other things, that pharmacies and licensed medication professionals are prohibited from: (i) "exercising undue influence" on a patient by promoting the sale of drugs so as to exploit the patient for the financial gain of the licensee or of a third party; and (ii) "directly or indirectly" giving, soliciting, receiving, or agreeing to receive any fee or other consideration to or from a third party in connection with the performance of professional services.

189.    Here, the Defendants colluded with Prescribers and Clinic Controllers associated with various No-Fault Clinics, which treat thousands of Insureds, to have the Prescribers prescribe,

51

or purport to prescribe, the Fraudulent Pharmaceuticals, including the Fraudulent Topical Pain Products and Vimovo Products, and then have those prescriptions directed to Navar Pharmacy so that the Defendants could bill GEICO huge sums.

190. In furtherance of the scheme, the Prescribers intentionally prescribed, or purported to prescribe, the Fraudulent Pharmaceuticals to patients of the No-Fault Clinics pursuant to collusive arrangements and fraudulent predetermined protocols, and without regard to genuine patient care, without regard to cost and attention to fiscal responsibility, and often without regard to pharmacologic outcomes.

191. The Prescribers prescribed, or purported to prescribe, the Fraudulent Pharmaceuticals to patients of No-Fault Clinics, while the Defendants dispensed, or purported to dispense the Fraudulent Pharmaceuticals, despite their knowledge that they were involved in illegal, collusive arrangements designed to exploit the patients for financial gain; the Fraudulent Pharmaceuticals were often being prescribed without regard to pharmacologic outcomes; the Fraudulent Pharmaceuticals were often being prescribed with gross indifference to patient health, care, and safety; the Fraudulent Topical Pain Products and Vimovo Products were prescribed as a matter of course without any recommendation that patients first try OTC products; and that the Fraudulent Pharmaceuticals were prescribed without attention to cost and fiscal responsibility, given that there are FDA-approved drugs available and appropriate for the particular patients at significantly less cost.

192. The Defendants, in collusion with the Prescribers and Clinic Controllers, made sure the Insureds never had the option to use a pharmacy of their choosing, and instead ensured that the prescriptions for the Fraudulent Pharmaceuticals were directed to Navar Pharmacy notwithstanding that (i) in most instances the No-Fault Clinics and the patients themselves were

located in counties far from Navar Pharmacy and (ii) there were countless other pharmacies located much closer to the No-Fault Clinics and the patients.

193. After having the prescriptions steered to Navar Pharmacy, the Defendants purported to deliver the Fraudulent Pharmaceuticals directly to the Insureds' homes, or alternatively, the Insureds were given the Fraudulent Pharmaceuticals dispensed by Navar Pharmacy directly from the front desk staff at the various No-Fault Clinics.

194. The Defendants, Prescribers, and Clinic Controllers virtually never gave the Insureds the option to identify a pharmacy of their choosing to ensure that the prescriptions were filled by Navar Pharmacy, and to ensure that the Defendants benefitted financially from the prescriptions.

195. The Prescribers had no legitimate medical reason to prescribe the Fraudulent Pharmaceuticals in large quantities to the patients, and Navar Pharmacy had no legitimate reason to dispense, the Fraudulent Pharmaceuticals in large quantities to their patients.

196. The Prescribers and Clinic Controllers had no legitimate reason to direct the prescriptions for the Fraudulent Pharmaceuticals to Navar Pharmacy rather than to a multitude of other pharmacies that were equally capable of dispensing the prescriptions and often more convenient to many of the patients.

197. The Defendants, Prescribers, and Clinic Controllers would not have engaged in the illegal, collusive arrangements in violation of New York law, including intentionally prescribing the Fraudulent Pharmaceuticals, and directing those prescriptions to Navar Pharmacy, unless they profited from their participation in the illegal scheme.

198. But for the payments of kickbacks or other financial incentives from the Defendants, the Prescribers would not have prescribed the Fraudulent Topical Pain Products, or

the volume of other Fraudulent Pharmaceuticals, and the Prescribers and Clinic Controllers would not have directed the prescriptions to Navar Pharmacy.

199.    The Defendants, Prescribers, and Clinic Controllers affirmatively concealed the particular amounts paid in kickbacks for steering the prescriptions to Navar Pharmacy since such kickbacks are in violation of New York law.

200.    Nevertheless, based on the circumstances surrounding the illegal, collusive, arrangements, the Defendants paid a financial kickback or provided other financial incentives, and the Prescribers and Clinic Controllers received a financial kickback or other financial incentives, for each of the particular prescriptions for the Fraudulent Pharmaceuticals that were dispensed by Navar Pharmacy.

201.    Upon information and belief, the payment of kickbacks or other financial consideration issued by the Defendants was made at or near the time the prescriptions were issued.

## IV.    The Fraudulent Billing the Defendants Submitted or Caused to be Submitted to GEICO

202.    Every prescription product, whether a brand name or generic drug, has a designated national drug code ("NDC") – a unique 10-digit code that identifies the drug itself, the vendor of the drug and the quantity in which the drug was packaged.  Each NDC number has an assigned Average Wholesale Price ("AWP").

203.    Each NDC (and, thus, the AWP) for a particular drug product differs depending on both the particular supplier the drug is purchased from and the quantity in which the drug is obtained.  The same drug can have a different NDC number if it is purchased from a different supplier and/or in different quantities.

204.    Pursuant to 12 N.Y.C.R.R. §§ 440.5(a) and (d) (the "Pharmacy Fee Schedule"), for each brand name (or ingredient included in a compounded product) a provider may charge no more

54

than the AWP assigned to that particular NDC on the day the drug was dispensed minus 12% of the AWP, plus a single dispensing fee of $4.00.

205.    For each generic drug (or ingredient included in a compounded product) the provider may charge no more than the AWP assigned to that particular NDC on the day the drug was dispensed minus 20% of the AWP, plus a single dispensing fee on $5.00.

206.    The Defendants solicited the Prescribers and Clinic Controllers to provide them with voluminous prescriptions for the Fraudulent Topical Pain Products and the Vimovo Products because the Defendants could readily buy the Fraudulent Topical Pain Products and the Vimovo Products at low cost but bill GEICO and other New York No-Fault insurers inflated amounts based on egregiously high wholesale prices.

207.    The Defendants intentionally targeted the Fraudulent Topical Pain Products and Vimovo Products, with extremely expensive "average wholesale prices," in order to inflate the billing submitted through Navar Pharmacy and to maximize their profits.

208.    In support of its charges, Navar Pharmacy typically submitted: (i) an NF-3 Form which included the purported NDC numbers, units, and corresponding charges for each drug product; (ii) a copy of the Prescribers' prescriptions; (iii) a delivery receipt or delivery tracking form; and (iv) an assignment of benefit form assigning the Insureds' benefits to the Defendants.

209.    The NDC numbers listed on the NF-3 Forms submitted by the Defendants through Navar Pharmacy are what identified the purported AWPs for each of the Fraudulent Pharmaceuticals.

210.    The Defendants never actually paid the targeted and egregious "average wholesale price" of the Fraudulent Topical Pain Products and the Vimovo Products that they dispensed, or

55

purported to dispense, because it is not a true representation of actual market price and is far above the actual acquisition cost for the Fraudulent Topical Pain Products and Vimovo Products.

211. The Defendants paid only a fraction of the "average wholesale price" of the Fraudulent Topical Pain Products and Vimovo Products that the Defendants targeted to use in connection with the billing submitted through Navar Pharmacy, but nevertheless billed GEICO and other No-Fault insurers egregious amounts far surpassing the cost of an array of other FDA approved, proven effective medications or commercially available over-the-counter products.

## V.   The Defendants' Submission of Fraudulent NF-3 Forms to GEICO

212. To support the fraudulent charges, statutorily prescribed claim forms for No-Fault Benefits have been submitted to GEICO by and on behalf of Navar Pharmacy seeking payment for the pharmaceuticals for which Navar Pharmacy is not entitled to receive payment.

213. These forms, including NF-3 forms and other supporting records that the Defendants submitted or caused to be submitted to GEICO, are false and misleading in the following material respects:

     i. The NF-3 forms and other supporting records uniformly misrepresented to GEICO that the Fraudulent Pharmaceuticals were medically necessary and intended for genuine patient care. In fact, the Fraudulent Pharmaceuticals were medically unnecessary and prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit patients for financial gain, without regard for genuine patient care;

     ii. The NF-3 forms and other supporting records uniformly misrepresented to GEICO that that the Fraudulent Pharmaceuticals were medically necessary and intended for genuine patient care, and that the charges were proper and not excessive. In fact, the Defendants intentionally inflated the billable charges to GEICO by targeting a specific set of pharmaceutical products that Navar Pharmacy dispensed in large volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals in order to inflate the charges to GEICO;

     iii. The NF-3 forms and other supporting records uniformly misrepresented to GEICO that the Defendants were in compliance with all material licensing

requirements and, therefore, are entitled to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 56-3.16(a)(12). In fact, the Fraudulent Pharmaceuticals were medically unnecessary and the Defendants did not comply with all material licensing requirements in that the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribers and Clinic Controllers to direct medically unnecessary and illegal prescriptions for the Fraudulent Pharmaceuticals to Navar Pharmacy in exchange for unlawful kickbacks and other financial incentives; and

iv.   The NF-3 forms and other supporting records uniformly misrepresented to GEICO that the Fraudulent Pharmaceuticals were medically necessary and intended for genuine patient care, and that the Defendants were in compliance with all material licensing requirements and, therefore, were entitled to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the Fraudulent Pharmaceuticals were medically unnecessary and the Defendants did not comply with all material licensing requirements in that they dispensed the Fraudulent Pharmaceuticals pursuant to illegal, duplicitous, invalid, and/or unauthorized prescriptions;

## VI.   <u>The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance</u>

214.   The Defendants are legally and ethically obligated to act honestly and with integrity in connection with the provision of pharmaceutical products to Insureds and the billing they submit or cause to be submitted to GEICO seeking reimbursement for those products.

215.   To induce GEICO to promptly pay the charges for the Fraudulent Pharmaceuticals, the Defendants have gone to great lengths to systematically conceal their fraud.

216.   Specifically, the Defendants knowingly have misrepresented and concealed facts in an effort to prevent discovery that (i) the Fraudulent Pharmaceuticals were prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; and (ii) the Defendants were involved in collusive kickback arrangements with the Prescribers and Clinic Controllers designed to generate voluminous prescriptions solely to maximize the billing to GEICO and other New York insurance companies.

217.    The billing and supporting documentation submitted by the Defendants for the Fraudulent Pharmaceuticals, when viewed in isolation, does not reveal its fraudulent nature.

218.    Because the billing and supporting documentation submitted by Defendants did not reveal its fraudulent nature, GEICO voluntarily issued payments in response to the Defendants' billing submissions in accordance with the No-Fault Laws.

219.    As noted above, as part of their fraudulent scheme, the Defendants have hired law firms to pursue collection from GEICO and other insurers of the fraudulent charges submitted through Navar Pharmacy. These law firms routinely file numerous individual, expensive, and time-consuming collection proceedings, in piece-meal fashion against GEICO and other insurers if the charges are not promptly paid in full, all as part of the scheme and to monetize the Defendants' fraudulent activity as quickly as possible. In fact, the Defendants continue to have legal counsel pursue collection against GEICO and other insurers without regard for the fact that Navar Pharmacy has been engaged in fraud.

220.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days.  The facially-valid documents that were submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damages of approximately $1,645,716.80 representing voluntary payments made by GEICO based upon the submission of the fraudulent charges by the Defendants to GEICO, which damages are to be trebled under 18 U.S.C. § 1962(c)), et al. to $4,937,150.40.

221.    Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

## THE FIRST CLAIM FOR RELIEF
### Against All Defendants
### (Declaratory Judgment – 28 §§ 2201 and 2202)

222. GEICO incorporates as though fully set forth herein, each and every allegation in the paragraphs set forth above.

223. There is an actual case and controversy between GEICO and the Defendants regarding approximately $1,132,607.59 in fraudulent billing for the Fraudulent Pharmaceuticals that the Defendants submitted or caused to be submitted to GEICO through Navar Pharmacy.

224. Navar Pharmacy has no right to receive payment for any pending bills submitted to GEICO for the Fraudulent Pharmaceuticals because Navar Pharmacy billed for pharmaceutical products that were medically unnecessary and/or prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care.

225. Navar Pharmacy has no right to receive payment for any pending bills submitted to GEICO for the Fraudulent Pharmaceuticals because the Defendants intentionally inflated the billable charges to GEICO by targeting a specific set of pharmaceutical products that Navar Pharmacy dispensed in large volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals solely for financial gain in violation of law.

226. Navar Pharmacy has no right to receive payment for any pending bills submitted to GEICO for the Fraudulent Pharmaceuticals because the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribers and Clinic Controllers to direct prescriptions for the Fraudulent Pharmaceuticals to Navar Pharmacy in exchange for unlawful kickbacks and other financial incentives.

227. Navar Pharmacy has no right to receive payment for any pending bills submitted to GEICO for the Fraudulent Pharmaceuticals because the Defendants submitted or caused to be submitted charges for the Fraudulent Pharmaceuticals dispensed by Navar Pharmacy pursuant to illegal, duplicitous, invalid, and/or unauthorized prescriptions.

228. The Defendants, including Navar Pharmacy, violated New York State regulatory and licensing requirements and submitted an enormous volume of fraudulent billing as to which Defendants have no right to reimbursement.

229. Accordingly, GEICO requests a judgement pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Defendants have no right to receive payment for any pending bills for the Fraudulent Pharmaceuticals submitted to GEICO through Navar Pharmacy.

**THE SECOND CLAIM FOR RELIEF**
**Against Bamshad and the John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

230. GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

231. Navar Pharmacy is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

232. Bamshad and the John Doe Defendants knowingly conducted and/or participated, directly or indirectly, in the conduct of Navar Pharmacy's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mail and interstate wires to submit or cause to be submitted thousands of fraudulent charges for over three years, seeking payments that Navar Pharmacy was not eligible to receive under the No-Fault Laws because: (i) the billed-for pharmaceutical products

60

were not medically necessary and/or were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Defendants intentionally inflated the billable charges to GEICO by targeting a specific set of pharmaceutical products that they acquired at low cost and had Navar Pharmacy dispense in large volumes to Insureds at egregious charges, in place of other effective, less costly pharmaceuticals solely for financial gain, in violation of law; (iii) the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribers and Clinic Controllers to direct prescriptions for the Fraudulent Pharmaceuticals to Navar Pharmacy in exchange for unlawful kickbacks and other financial incentives; and (iv) the billed-for pharmaceutical products were the product of illegal, duplicitous, invalid, and/or unauthorized prescriptions. The fraudulent bills and corresponding mailings/interstate wire transmissions submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1."

233.    Navar Pharmacy's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud and wire fraud are the regular way in which Bamshad and the John Doe Defendants operated Navar Pharmacy, inasmuch as Navar Pharmacy never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud and wire fraud therefore were essential in order for Navar Pharmacy to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud and wire fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to submit, or cause to be submitted, fraudulent claims to GEICO, and continue to attempt collection on the fraudulent billing submitted through Navar Pharmacy to the present day.

234. Navar Pharmacy is engaged in inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it was created to exploit the New York "No-Fault" insurance system; engage in illegal, collusive arrangements involving prescriptions for the Fraudulent Pharmaceuticals; and bill pursuant to predetermined fraudulent protocols solely to financially enrich the Defendants. These inherently unlawful acts are taken by Navar Pharmacy in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

235. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $1,645,716.80 pursuant to the fraudulent bills submitted by the Defendants through Navar Pharmacy.

236. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**THE THIRD CLAIM FOR RELIEF**
**Against Bamshad and the John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

237. GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

238. Navar Pharmacy is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

239. Bamshad and the John Doe Defendants are employed by or associated with the Navar Pharmacy enterprise.

240. Bamshad and the John Doe Defendants knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of Navar Pharmacy's

affairs through a pattern of racketeering activity consisting of repeated violations of the federal maid fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mail and interstate wires to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over three years, that Navar Pharmacy was not eligible to receive under the New York no-fault insurance laws because: (i) the billed-for pharmaceutical products were not medically necessary and/or were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Defendants intentionally inflated the billable charges to GEICO by targeting a specific set of pharmaceutical products that they acquired at low cost and had Navar Pharmacy dispense in large volumes to Insureds at egregious charges, in place of other effective, less costly pharmaceuticals solely for financial gain, in violation of law; (iii) the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribers and Clinic Controllers to direct prescriptions for the Fraudulent Pharmaceuticals to Navar Pharmacy in exchange for unlawful kickbacks and other financial incentives; and (iv) the billed-for pharmaceutical products were the product of illegal, duplicitous, invalid, and/or unauthorized prescriptions. The fraudulent bills and corresponding mailings/interstate wire transmissions submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1."

241.    Bamshad and the John Doe Defendants knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of fraudulent charges to GEICO.

63

242.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $1,645,716.80 pursuant to the fraudulent bills submitted by the Defendants through Navar Pharmacy.

243.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**THE FOURTH CLAIM FOR RELIEF**
**Against Navar Pharmacy, Bamshad, and the John Doe Defendants**
**(Common Law Fraud)**

244.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

245.    Navar Pharmacy, Bamshad, and the John Doe Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Pharmaceuticals under the name of Navar Pharmacy.

246.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the billed-for pharmaceutical products were medically necessary and properly billed when in fact the billed-for pharmaceutical products were not medically necessary and/or were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) in every claim, the representation that Navar Pharmacy acted in accordance with material licensing requirements and properly billed for the billed-for pharmaceutical products and, therefore, was entitled to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the Defendants intentionally inflated the billable

charges to GEICO by targeting a specific set of pharmaceutical products that they acquired at low cost and had Navar Pharmacy dispense in large volumes to Insureds at egregious charges, in place of other effective, less costly pharmaceuticals solely for financial gain, in violation of law; (iii) in every claim, the representation that Navar Pharmacy acted in accordance with material licensing requirements and, therefore, was entitled to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribers and Clinic Controllers to direct prescriptions for the Fraudulent Pharmaceuticals to Navar Pharmacy in exchange for unlawful kickbacks and other financial incentives; and (iv) in every claim, the representation that Navar Pharmacy acted in accordance with material licensing requirements and properly billed for legitimately prescribed pharmaceutical products and, therefore, was entitled to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the billed-for pharmaceutical products were the product of illegal, duplicitous, invalid, and/or unauthorized prescriptions, rendering the pharmacy ineligible for reimbursement for No-Fault benefits.

247.    The Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Navar Pharmacy that were not compensable under the No-Fault Laws.

248.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $1,645,716.80 pursuant to the fraudulent bills submitted by the Defendants through Navar Pharmacy.

249.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

250.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## THE FIFTH CLAIM FOR RELIEF
### Against Navar Pharmacy, Bamshad, and the John Doe Defendants
### (Unjust Enrichment)

251.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

252.    As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

253.    When GEICO paid the bills and charges submitted by or on behalf of Navar Pharmacy for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

254.    The Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that the Defendants voluntarily accepted and profited from, as a result of, among other things, the payments received, notwithstanding their improper, unlawful, and unjust fraudulent billing scheme.

255.    The Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

256.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in the approximate amount of $1,645,716.80.

66

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a judgment be entered in their favor and against the Defendants, as follows:

A.     On the First Claim for Relief against the Defendants, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Navar Pharmacy has no right to receive payment for any pending bills, amounting to approximately $1,132,607.59 submitted to GEICO;

B.     On the Second Claim for Relief against Bamshad and the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $1,645,716.80, together with treble damages, punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

C.     On the Third Claim for Relief against Bamshad and the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $1,645,716.80, together with treble damages, punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

D.     On the Fourth Claim for Relief against Navar Pharmacy, Bamshad, and the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $1,645,716.80, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

E.     On the Fifth Claim for Relief against Navar Pharmacy, Bamshad, and the John Doe Defendants, a recovery in favor of GEICO in an amount to be determined at trial but approximately $1,645,716.80, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper.

Dated: June 16, 2025
      Uniondale, New York

                          RIVKIN RADLER LLP

                          By:   /s/ *Michael A. Sirignano*

                                  Michael A. Sirignano
                                  Barry I. Levy
                                  Jennifer Abreu
                                  Brandon Barbaruolo
                        926 RXR Plaza
                        Uniondale, New York 11556
                        (516) 357-3000

                        *Counsel for Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*